UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JAY MARSHALL STRABALA, individually and doing business as 2DEFINE ARCHITECTURE, | ) ) ) ) | |
| Plaintiff, | ) ) | No. 15 C 1228 |
| v. | ) ) | Judge Thomas M. Durkin |
| QIAO ZHANG and ZHOU SHIMIAO, d/b/a/ PUFINE (SHANGHAI) ARCHITECTS DESIGN FIRM (GENERAL PARTNERSHIP), also d/b/a DIFINE (SHANGHAI) ARCHITECTS DESIGN FIRM (GENERAL PARTNERSHIP), | ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jay Marshall Strabala brought this action against Defendants Qiao Zhang and Zhou Shimiao (referred to collectively as "Defendants" and individually as "Zhang" and "Zhou")[1] alleging defamation and intentional interference with his business. The parties are former partners in an architectural services firm called 2DEFINE Architecture ("2DEFINE"). For reasons that are very much in dispute, the partnership soured and litigation ensued, first in China where the partnership was centered, and then in Illinois with the current lawsuit. In a minute order entered on October 31, 2016, the Court ruled on several pending motions as follows:

---

[1] Strabala contends that Defendants should be referred to as "Qiao" and "Zhou" because in China the family name comes before the given name. *See https:// www.travelchinaguide.com/essential/chinese-name.htm.* Defendants respond that they know their own names and that their respective family names are Zhang and Zhou. The Court will take Defendants' word and refer to them as Zhang and Zhou.

(1) Plaintiff's Motion to Strike Exhibits to Defendants' Reply, R. 41, was granted;

(2) Defendants' Rule 12(b) Motion to Dismiss, R. 30, was granted in part and denied in part, with (a) the motion to dismiss for lack of subject matter jurisdiction being denied, (b) the motion to dismiss for lack of service of process being denied, (c) the motion to dismiss for lack of personal jurisdiction being denied as to Count 1 (Defamation) and granted as to Count II (Intentional Interference), (d) the motion to dismiss Count II (Intentional Interference) for failure to state an adequate claim for relief being granted; and (3) Defendants' Motion to Vacate Default Judgment, R. 22, was granted. The Court now sets forth the reasons for these rulings.

## BACKGROUND[2]

Strabala is an American architect whose practice focuses on the design of performing arts complexes, convention centers, and high-rise office buildings. *See* R. 33-1 (Strabala Decl., ¶ 3); R. 33-9 at 10; *www.flickr.com/people/architectural-design/?ytcheck=1* (stating that Strabala is an expert in supertall building design, sustainable design of commercial buildings, and the design of performing arts venues). In promotional materials for his architectural firm, Strabala is described as a leader of "the next generation of Super-tall Building Designers," who designed the two tallest skyscrapers in the world—the Dubai Burj Khalifa in the United Arab Emirates (currently the tallest building in the world) and the Shanghai Tower in China (currently the second tallest building in the world, the tallest building in

---

[2] The facts in this section are taken from the complaint, Strabala's deposition testimony and responses to interrogatories, three sworn declarations by Strabala, two sworn affidavits each by Zhang and Zhou, an Affidavit of Service by Pamela Ickes, and various other exhibits submitted by the parties.

China, and the tallest building in the world with "two skins"[3]). Other notable projects of Strabala's include the Houston Ballet Center for Dance, the Yingkou Convention and Exposition Center in China, and the Convention and Exhibition Center in Hong Kong.

Strabala was born in Seattle and grew up in San Francisco. He went to undergraduate school at UCLA and then received a Master of Architecture at Harvard. His first job after graduating from Harvard was with the architectural firm of Skidmore Owings & Merrill ("SOM") in Chicago. He lived in a rented apartment for roughly his first ten years, and then, in or around 1999, he and his wife purchased a condominium in a well-known high-rise building in Chicago designed by the famed architect Ludwig Mies van der Rohe (hereinafter "the Lake Shore Drive Condo"). Strabala worked at SOM until March 2006, at which time he accepted a position with the Houston office of another architectural design firm, M. Arthur Gensler Jr. & Associates, Inc. ("Gensler"). From 2006 until 2008, Strabala made frequent trips to Shanghai as part of Gensler's team preparing to offer a design bid for the Shanghai Tower. In 2008, it was announced that Gensler had won the design competition, and thereafter Strabala began working almost exclusively from Shanghai while the Tower was being constructed.

In March 2010, before the Tower was completed, Strabala had a falling out with Gensler and his employment with that firm terminated. A short time later,

---

[3] The unique design features of the Shanghai Tower, including its double layer transparent façade or "two skins," are described in 2DEFINE promotional materials, as well as in an informative Wikipedia article, *see https://en.wikipedia.org/wiki/Shanghai_Tower.*

Strabala formed his own architectural firm called Strabala & Woo Architects, LLC.[4] Strabala is the majority shareholder of S&W and his wife is the Secretary. In June 2010, Strabala and three Chinese partners (Zhang, Zhou, and one other who has since left the partnership) founded 2DEFINE, with Strabala funding the partnership's start-up costs through a transfer of capital from S&W.[5]

From 2010 to 2014, 2DEFINE was commissioned to design four super tall towers in China, with Strabala as the lead designer. Strabala remained in Shanghai during this time. While working on those projects from China, Strabala also was being sued in the United States by his two former employers. In a lawsuit filed in the Northern District of Illinois in June 2011, Gensler alleged that after Strabala founded his own firm he publicly misrepresented his role in several projects, including the Shanghai Tower, while minimizing or entirely omitting the nature of Gensler's contribution. The day after Gensler filed its lawsuit, SOM made similar allegations against Strabala (including the allegation that he falsely took design credit for the Burj Khalifa) in a lawsuit filed in the Southern District of New York. In February 2012, the district court in Gensler's lawsuit dismissed the case for failure to state a claim, while, in June 2012, the district court in SOM's lawsuit

---

[4] It appears that the company's name originally was Strabala & Woo Architects2 LLC, which was later changed to Strabala & Woo Architects, LLC, and then to Strabala + Architects LLC. *See* R. 33-8. The Court will refer to the company simply as "S&W."

[5] The four partners of 2DEFINE also opened a Chinese business entity, DeFan Architectural Consulting Shanghai Ltd., to facilitate 2DEFINE doing business with Chinese clients. The Court refers only to 2DEFINE in this opinion without purporting to distinguish between that entity and its Chinese counterpart.

transferred the case to the Northern District of Illinois where the court would have personal jurisdiction over Strabala. About six months after the SOM lawsuit was transferred to Illinois, that case settled. Meanwhile, Gensler had filed an appeal from the district court's dismissal of its lawsuit. Approximately two years after the district court's dismissal, the Seventh Circuit issued an opinion vacating and remanding the case with instructions to the district court to conduct further proceedings.[6] Approximately six months after the Seventh Circuit's ruling (which was shortly after the present lawsuit was filed), Gensler voluntarily dismissed the case.

The complaint in this case alleges that while all of the above was taking place, Zhang and Zhou were secretly diverting money from 2DEFINE. Strabala alleges that, in approximately March 2014, he discovered the existence of two separate Chinese partnerships with similar-sounding names to 2DEFINE's Chinese name (the DeFan entity). Strabala claims Zhang and Zhou secretly formed those entities to facilitate their embezzlement. Zhang and Zhou, of course, deny any wrongdoing. Whatever the reason for the partnership's break-up, litigation in China between the parties followed Strabala's alleged discovery. The complaint before this

---

[6] Although it vacated and remanded, the Seventh Circuit expressed some doubt as to the validity of Gensler's claims. *See Gensler v. Strabala,* 764 F.3d 735, 738 (7th Cir. 2014) ("Yet if the gist of Gensler's complaint is that big projects require big teams—and that Gensler insists on institutional rather than personal credit— where's the falsity?"). Strabala continues to take credit for the design of the Shanghai Tower, although the Wikipedia article does not mention him by name, noting that the building "was designed by the American architectural firm Gensler, with Chinese architect Jun Xia leading the design team." *https://en.wikipedia.org /wiki/Shanghai_Tower.*

Court asserts that, while the Chinese litigation was on-going,[7] Zhang and Zhou sent e-mails to various business and professional associates of Strabala's falsely accusing him of numerous improprieties, including forging signatures on documents, engaging in "visa fraud," engaging in the unauthorized use of copyrighted software, misrepresenting his accomplishments and status as a designer and architect, and engaging in "money laundry [sic]" and "tax fraud." R. 1 at 8 (¶ 33). At least some of the individuals who received the e-mails are located in Chicago, including Strabala's accountant, his attorney, several former colleagues at SOM, and the Executive Director of the Council of Tall Buildings, of which Strabala is a member. Strabala also alleges that Zhang and Zhou have communicated Strabala's confidential business information to Gensler and SOM, stolen property belonging to 2DEFINE, and interfered with 2DEFINE's clients and employees.

Strabala filed this complaint on February 9, 2015 and attempted to effect service on Zhang and Zhou through the Chinese Ministry of Justice pursuant to the procedures set forth in the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague Convention"). On November 10, 2015, Strabala informed the Court that he was having trouble serving Zhang and Zhou in China, and requested that the Court enter an order granting him permission to serve by alternative means. On November 17, 2015, the

---

[7] The Chinese litigation apparently includes three different lawsuits: (1) a lawsuit brought by Zhou against Strabala; (2) a lawsuit brought by Strabala against Zhang and Zhou; and (3) a lawsuit brought by Zhou's Chinese architecture firm, Tufan Architects Design Firm, against Strabala. Zhou states in his affidavit that the first two lawsuits have been resolved, while the third was still pending at the time the affidavit was filed.

Court entered an order permitting alternative service by e-mail and Federal Express. On January 12, 2016, believing that the e-mail service had been successful and with the time for an answer or response to the complaint having expired, Strabala filed a motion for default judgment. The Court granted Strabala's motion on January 14, 2016, and an Order of Default Judgment was entered on the docket on January 19, 2016. *See* R. 17. Approximately four weeks later, Zhang and Zhou appeared in the case and filed the Motion to Vacate and Motion to Dismiss, in which they argue the Court's entry of default is void and the case should be dismissed because the Court lacks subject matter jurisdiction over the complaint and personal jurisdiction over them and because Strabala's service of process on them was invalid. In the alternative, Zhang and Zhou argue in their Motion to Vacate that, even if the entry of default against them was not void, it should be vacated because they had good cause for their default, they took quick action to correct it, and a meritorious defense to the complaint exists. They also argue that Count II of the complaint should be dismissed because it fails to state a legally adequate claim for relief.

## MOTION TO VACATE DEFAULT JUDGMENT

Federal Rule of Civil Procedure 55(c) provides that the district court may set aside an entry of default "[f]or good cause shown," and may set aside a default judgment "in accordance with Rule 60(b)." Fed. R. Civ. P. 55(c). Regardless of which standard applies,[8] Defendants would be entitled to an order vacating the default

---

[8] When a party has failed to plead or otherwise defend a lawsuit, entry of default under Rule 55(a) must precede grant of a default judgment under Rule 55(b).

entered against them if the Court lacks subject matter jurisdiction over the case or personal jurisdiction over them, or if Defendants received insufficient service of process. *See, e.g., Trade Well Int'l v. United Cent. Bank*, 825 F.3d 854, 859 (7th Cir. 2016) (a final judgment is void and must be set aside if the court lacked personal jurisdiction or if the party against whom the judgment was entered was not adequately served); *United States v. Indoor Cultivation Equip. from High Tech Indoor Garden Supply*, 55 F.3d 1311, 1316 (7th Cir. 1995) ("a judgment is void for purposes of Rule 60(b)(4) if the court that rendered it lacked jurisdiction of the subject matter, or of the parties, or if it acted in a manner inconsistent with due process of law") (internal quotation marks and citation omitted). A district court's refusal to vacate a void judgment constitutes a per se abuse of discretion. *Trade Well Int'l*, 825 F.3d at 859. But even if the entry of default against Defendants was not void on jurisdictional grounds, the Court can still vacate it under general "good cause" principles applicable to Rule 55(c) motions. The Court will begin by assuming for present purposes only that the entry of default is not void on jurisdictional grounds, and resolve the easier question first of whether the entry of default should be vacated for "good cause." Finding good cause to exist for vacating the entry of

_____

Wright & Miller, 10A FED. PRAC. & PROC. CIV. § 2682 (4th ed.). Here, the January 19, 2016 Order of Default Judgment (R. 17) refers to a "default judgment," and it is preceded by the Court's January 14, 2016 minute order granting "Plaintiff's motion for default judgment." R. 15. Nevertheless, the Order of Default Judgment contemplated a prove-up hearing to establish the amount of Strabala's damages. Therefore, it is clear that a final default judgment had not yet been entered in the case at the time Defendants filed their Motion to Vacate, *see In re Catt*, 368 F.3d 789, 793 (7th Cir. 2004), which means that the Court's January 19, 2016 Order of Default Judgment constituted an entry of default under Rule 55(a), not a default judgment under Rule 55(b).

default, the Court will then go on in the next sections to address Defendants' jurisdictional arguments for dismissal of the complaint.

"A party seeking to vacate an entry of default prior to the entry of final judgment must show: (1) good cause for the default; (2) quick action to correct it; and (3) a meritorious defense to the complaint." *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 630 (7th Cir. 2009) (internal quotation marks and citation omitted) Strabala argues that Defendants cannot show good cause for failing to respond to this lawsuit in a timely manner because, among other things, they knew about the litigation as early as May 2015 when Strabala personally hand-delivered a copy of the complaint to Zhou at a court proceeding in Shanghai. Moreover, Strabala points out that both Zhou and Zhang were served with a copy of the complaint and summons by e-mail and still did not file a timely response. Instead, they waited until an e-mail was sent notifying them of the motion for entry of default, and only then did they take action to obtain an attorney in the United States and file the Motion to Vacate.

In response, Defendants admit that, in May 2015, Strabala "threw a copy of the Complaint at Defendant Zhou" at a court proceeding in Shanghai and that Zhou immediately showed it to Zhang. But Defendants contend "they did not appreciate that they had been sued in Illinois" at this time because they "are Chinese architects with no legal training or familiarity with the U.S. legal system." R. 22 at 5. Further, because Strabala already had filed a lawsuit against them in Shanghai, they argue they reasonably assumed that if he intended to sue them again "he

would do so in China." *Id.* They also contend that receipt of e-mail service did not adequately notify them of the lawsuit because it was their belief, based on Chinese law, "that service could only be properly made on them through formal government service, as opposed to an e-mail to one of them from a secretary at counsel's office." *Id.*

Before the break-up of 2DEFINE, Defendants were involved in Strabala's defense of the SOM and Gensler litigation. Therefore, the Court takes Defendants' assertion that they have no "familiarity with the U.S. legal system" with a grain of salt. While they may not be familiar with the specifics of American civil procedure, they are business professionals with past experience working for American companies (in Zhang's case, living and working in the United States). Even without this business background, a reasonably diligent person would have made inquiries or sought expert advice as to how to respond, not simply ignore something which they both claim they did not understand. The Court also is skeptical of Defendants' assertion that they did not realize Strabala was intending to sue them in the United States. Both Zhang and Zhou have represented to the Court that they are fluent in English, and the case caption on the complaint clearly informed them that the lawsuit was in the United States. Finally, the Court does not accept as "good cause" Defendants' explanation that they did not respond to the complaint because they questioned whether service by e-mail was legally sufficient. "[S]ervice of process laws are designed to ensure defendants receive notice in accordance with concepts of due process." *United States v. Jiles*, 102 F.3d 278, 282 (7th Cir. 1996). For this

reason, the plaintiff must effect proper service pursuant to Rule 4, even if the defendant has actual notice of the lawsuit. *See McMasters v. United States*, 260 F.3d 814, 817 (7th Cir. 2001). Nevertheless, the requirement of formal service is not intended to provide a defendant who has actual knowledge that a lawsuit was filed against him with an excuse for ignoring service. To be sure, a defendant who receives actual notice of a lawsuit has the right to insist on strict adherence to procedural formalities. But the issue here is not whether Defendants' actual knowledge of the litigation conferred jurisdiction when process was not properly served. Rather, the issue is, assuming valid service of process, whether Defendants' belief that there were defects in the service of process constituted good cause for their default. Defendants are free to do exactly as they did, which is, to simply ignore the lawsuit. But by doing so, they assumed the risk they might be wrong about whether the form of service was legally sufficient. Defendants were not forced to take that risk because, knowing about the lawsuit, they could have immediately obtained legal representation and filed a motion to quash service. Being wrong about what is legally sufficient service, however, is not good cause to excuse their default. *See O'Brien v. R.J. O'Brien & Assocs., Inc.,* 998 F.2d 1394, 1402-04 (7th Cir. 1993) (where defendant was aware of the lawsuit but believed, erroneously, that service of process was defective, court would not overturn district court's denial of motion to vacate default judgment, even if, as defendant argued, a party has no duty "to challenge service of process before proper service of process has been

obtained"; "[t]he district court was not compelled to relieve [defendant] of the consequences of its improvident tactical decision").

Looking at the record as a whole, the Court suspects that Defendants might have been trying to evade service.[9] But the Court will give Defendants the benefit of the doubt and assume instead that they did not respond to the complaint out of confusion caused by the rather complicated situation with multiple lawsuits in different countries and service effected through an atypical and thus unexpected method. Nevertheless, the Court need not decide whether Defendants' confusion rises to the level of good cause for their default. Rule 55(c)'s "good cause" standard is a lenient one that does not depend on there being a good excuse for the defendant's failure to appear in a timely manner. Instead, "Rule 55(c) requires 'good cause' for the judicial action, not 'good cause' for the defendant's error." *Sims v. EGA Prods., Inc.*, 475 F.3d 865, 868 (7th Cir. 2007). Thus, "[d]amages disproportionate to the wrong afford good *cause* for judicial action, even though there is no good *excuse* for the defendant's inattention to the case." *Id.* (emphasis in original). Here, the Court's

---

[9] Strabala cites to other facts that support that suspicion. For instance, on February 27, 2016, after this Court's entry of default, written notice from the Chinese Ministry of Justice was received stating that Zhou had "refused to accept the documents" that the Ministry had attempted to serve on him. R. 33-17 (¶ 3). Moreover, after the first e-mail was sent to Zhang at the e-mail address he previously used in sending the allegedly defamatory e-mails about Strabala, a second e-mail was sent to the same address notifying Zhang that the motion for default judgment had been filed. Although the first e-mail did not "bounce back," the second e-mail did, suggesting the possibility that Zhang might have changed his e-mail address after being served with the complaint. The Seventh Circuit has held that "effort[s] to avoid service of process and frustrate the efficient administration of justice" are valid reasons to refuse to vacate a default entered against a party. *Swaim v. Moltan Co.*, 73 F.3d 711, 721 (7th Cir. 1996).

refusal to vacate the default would result in "damages disproportionate to the wrong" for a number of reasons.

First and foremost, the delay occasioned by Defendants' default did not prejudice Strabala by impinging upon his ability to pursue the litigation. "[D]elay that imposes slight injury does not call for multi-million-dollar awards." *Id.* at 869; *see, e.g., Fed. Trade Comm'n v. Construct Data Publishers*, 2014 WL 7004999, at *6 (N.D. Ill. Dec. 11, 2014) ("the disproportionate size of the default judgment—$9.1 million—in comparison with the minimal prejudice suffered by the FTC represents good cause to vacate the default judgment"). In addition, "this Circuit has a well established policy favoring a trial on the merits over a default judgment." *Sun v. Bd. of Trustees of Univ. of Ill.*, 473 F.3d 799, 811 (7th Cir. 2007) (citing *C.K.S. Eng'rs, Inc. v. White Mountain Gypsum Co.*, 726 F.2d 1202, 1205 (7th Cir. 1984) (collecting cases)). "For that reason, a default judgment should be used only in extreme situations, or when other less drastic sanctions have proven unavailing." *Id.* Defendants moved to set aside the default approximately four weeks after entry of default was made. It appears that they only acted when they learned that the Court had set a date for Strabala to prove-up his damages, and, in that sense, they did not act as expeditiously as they could have. But once having decided to act, the Court is willing to assume that it takes longer for a defendant located in a foreign country to find legal representation in the United States than a defendant in another state. For that reason, the cases cited by Strabala holding that an out-of-state litigant's difficulty in obtaining counsel does not constitute good cause to set

aside default, *see* R. 38 at 3, are distinguishable. Defendants acted relatively quickly upon learning of the entry of default and responded to the litigation before the prove-up hearing took place. At least in this respect, they were diligent.

Defendants also have shown a meritorious defense as to Count II of the complaint, as discussed later in this opinion, and have raised non-frivolous arguments regarding the Court's assertion of personal jurisdiction over them as to Count I. While the Court ultimately rejects Defendants' arguments as to Count I (as discussed later in this opinion), that rejection only reaches the issue of whether Strabala has made out a prima facie showing of personal jurisdiction. The Court therefore concludes that Defendants have shown a possible meritorious defense as to both counts in the complaint. Since Defendants entered an appearance, they have participated in the litigation by filing a motion to dismiss on jurisdictional grounds, followed by jurisdictional discovery and extensive briefing on the jurisdictional issues. Thus, Defendants have now shown that they are committed to actively defending themselves. Given the Seventh Circuit's preference for deciding cases on the merits and the lack of prejudice to Strabala, the Court concludes that it has good cause to overlook Defendants' initial failure to respond, and accordingly grants the Motion to Set Aside the Default Judgment.

## MOTION TO DISMISS FOR LACK OF
## SUBJECT MATTER JURISDICTION

Defendants have moved to dismiss the complaint for lack of subject matter jurisdiction. Before addressing the parties' substantive arguments on that motion, however, the Court must address Strabala's Motion to Strike.

## A.   MOTION TO STRIKE

### 1.   BACKGROUND

The documents at issue in Strabala's Motion to Strike are Exhibits F and G[10] to Defendants' reply brief in support of their Motion to Dismiss. *See* R. 39-6; R. 39-7. Exhibit F appears to be a letter from Strabala to his wife, delivered by Strabala via e-mail. Exhibit G appears to be an e-mail to Strabala from someone named "Ding Qing" from the "Shanghai Institute of American Studies," who purportedly interviewed Strabala for a book called "*Americans in Shanghai.*" Defendants also have included as part of Exhibit G a document they identify as the English translation of the article about Strabala purportedly written by Ding Qing, which is referenced in the e-mail from her as being attached. Strabala suggests that both the e-mail to his wife with the attached letter, and the e-mail from Ding Qing with the attached article, may be fake or else doctored from documents found on his personal laptop, which he alleges Zhang and Zhou stole from him. Zhang and Zhou admit that the e-mails came from Strabala's laptop, but assert that the laptop in question was a company laptop and therefore that Strabala had no privacy interest in its contents.

As a preliminary matter, the Court notes that, for reasons that will be made clear in the next section, Exhibits F and G, even if considered by the Court, would not change the Court's ruling on whether subject matter jurisdiction exists over this lawsuit. Indeed, Defendants themselves refer to these documents as "a relatively

---

[10] The motion erroneously states that the exhibits in question are G and H. *See* R. 41 at 1.

minor point of corroborative evidence." R. 45 at 6 n.4. With this admission and the Court's analysis and conclusions in the next section regarding subject matter jurisdiction, the Court could simply deny the Motion to Strike without prejudice as being moot and omit any discussion of the merits of that motion. Nevertheless, the Court has determined that the Motion to Strike should be addressed on the merits for two reasons: first, the overlap and potential impact of the issues raised in the parties' briefing on the Motion to Strike with the merits issues likely to be in dispute in the case going forward; and, second, the Court's concerns about potential misconduct by the parties to this litigation.[11]

## 2. LACK OF FOUNDATION

Zhang and Zhou, as the proponents of Exhibits F and G, bear the burden of establishing a foundation for their admission. *See United States v. Cejas*, 761 F.3d 717, 723 (7th Cir. 2014) (the admitting party bears the "burden of making a prima facie showing that the item is genuine"). This is done by submitting evidence "sufficient to support a finding that the item is what the proponent claims it is."

---

[11] On the second point, the Court's concerns relate not only to Strabala's accusations of potential theft and tampering of documents on Strabala's laptop, but also, as will be discussed in the next section, to Defendants' contentions that Strabala was "evasive" and "impertinent" (R. 56 at 3 n.1) at his deposition, and that he took an unreasonable position in jurisdictional discovery to avoid producing relevant information. The Court is not at this time finding in favor of either side on their allegations of misconduct and/or bad faith against each other, and specifically does not make any finding that impropriety has occurred. Nevertheless, both Strabala and Defendants should be aware that the Court takes the other sides' allegations of misconduct seriously, having concluded from an examination of the record that neither side's accusations are frivolous. The parties are forewarned that, going forward, the Court will expect full compliance with the rules of civil procedure and cooperation in discovery, and that gamesmanship will not be tolerated.

Fed. R. Evid. 901(a); *see Thanongsinh v. Bd. of Educ. Dist. U-46*, 462 F.3d 762, 779 (7th Cir. 2006) ("Rule 901's requirements are satisfied if evidence has been introduced from which a reasonable juror could find that the document is authentic."). "Only a prima facie showing of genuineness is required; the task of deciding the evidence's true authenticity and probative value is left to the jury." *United States v. Fluker*, 698 F.3d 988, 999 (7th Cir. 2012); *see also United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir. 2009) ("The district court's role is to serve as gatekeeper in assessing whether the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic."). Defendants offer several reasons why Exhibits F and G have an adequate foundation, each of which are considered and rejected below.

First, the Court rejects Defendants' argument that the e-mails do not need to be authenticated because they do not have to be admissible in court to be considered on a motion to dismiss for lack of subject matter jurisdiction. The cases cited by Defendants involve preliminary, non-final rulings, such as a jurisdictional ruling at the pleadings stage concerning the amount in controversy, *see Boncher-Wales Mktg. Grp., Inc. v. GXI Int'l, LLC,* 2009 WL 1259354, at *3 (N.D. Ill. May 1, 2009), and a preliminary injunction decision, *see Dexia Credit Local v. Rogan*, 602 F.3d 879, 885 (7th Cir. 2010). As the Court will discuss in the next section, Defendants have presented a factual challenge to the Court's subject matter jurisdiction. If the Court were to rule in Defendants' favor, the ruling would not be preliminary but rather would result in dismissal of the case. A final decision in Defendants' favor actually

terminating the case must be based on competent evidence. *Cf. Whitted v. Gen. Motors Corp.,* 58 F.3d 1200, 1204 (7th Cir. 1995) (unauthenticated evidence that would have been inadmissible at trial may not be considered in ruling on summary judgment).

Second, the Court also cannot accept Defendants' contention that Exhibit F has been authenticated by Strabala himself when, at the direction of this Court after a hearing was held on his Motion to Strike, he confirmed through his counsel that the letter to his wife attached to his e-mail was in fact sent by him. Strabala specifically stated that, although he sent his wife a letter similar to the one included in Exhibit F, he believes Defendants' copy of that letter may have been doctored. Accordingly, Strabala did not authenticate the version of the letter on which Defendants rely.[12]

Third, the Court rejects Defendants' contention that Exhibits F and G are self-authenticating under Federal Rule of Evidence 902(7). Rule 902(7) provides that "[a]n inscription, sign, tag, or label purporting to have been affixed in the course of business and indicating origin, ownership, or control," need not be

---

[12] Strabala could be "deemed" to have verified the e-mails' authenticity if he was the party who produced them. *See, e.g., In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 769, 781 (C.D. Cal. 2004) ("Although none of these documents have affidavits from the actual authors laying the foundation that the emails are what they purport to be, these documents are deemed authentic because Plaintiff identified the documents as being produced by parties in discovery.") (internal citation omitted); *Jimena v. UBS AG Bank, Inc.*, 2011 WL 2551413, at *5 (E.D. Cal. June 27, 2011) (e-mails sought to be introduced by the plaintiff were not authenticated by the discovery process because they were produced in discovery by the plaintiff, not by the defendants). In this case, the e-mails were not produced in discovery, and Defendants did not obtain them from Strabala.

supported by extrinsic evidence of authenticity. According to Defendants, (1) Strabala's electronic signature on his e-mail, (2) the 2DEFINE letterhead on Strabala's letter to his wife, and (3) the typed name "Ding Qing" on her e-mail, together with her contact information at the "Shanghai Institute of American Studies," constitute "trade inscriptions" within the meaning of Rule 902(7). Defendants, however, cite no case law that would support finding that either an electronic signature or a typed name and address in an e-mail constitute trade inscriptions under Rule 902(7). Moreover, their argument is inconsistent with Seventh Circuit case law holding that a trade inscription on the cover of an owner's manual does not authenticate the contents of the manual. *See Whitted,* 58 F.3d at 1204 ("The owner's manual is not a trade inscription and admitting the manual because it had a trade inscription on its cover does not comport with the rule"). In any event, even if the letterhead on the letter to Strabala's wife constitutes a "trade designation," it would be one for 2DEFINE not Strabala personally. And, even if the e-mail from Ding Qing is authenticated by her typed name and address, the article submitted as part of Exhibit G is not authenticated by the e-mail because Defendants have not submitted an affidavit or other evidence establishing that the article they include in Exhibit G is a true and correct copy of the attachment referenced by Ding Qing in the e-mail.

Aside from the above, Rule 902(7) only provides for "presumptive authenticity," and "does not preclude the opponent from challenging the authenticity of the offered writing, such as with proof that the document is a phony

or bears a forged signature. Nor does it resolve questions as to the source or accuracy of information that is reported in self-authenticated documents. Objections can still be made that inadmissible hearsay statements or expert opinions are included in, for example, newspapers or periodicals." 2 MCCORMICK ON EVID. § 229.1 (7th ed.). Strabala has presented evidence through his declaration rebutting the presumptive authenticity that might be conferred by Rule 902(7). For instance, he states that his signature is an electronic one which could have been placed there without his permission because Zhang and Zhou had access to it through 2DEFINE's computers. He also states that these e-mails were located on the hard drive of his personal laptop, which was stolen from him by Zhang and Zhou.

Defendants do not expressly deny Strabala's accusation that they stole his personal laptop. Their only argument is that the e-mails were found on Strabala's work laptop. If the e-mails came from Strabala's personal laptop and if Defendants stole that laptop, the evidence would be inadmissible. *See Xyngular Corp. v. Schenkel*, 2016 WL 4126462, at *33 (D. Utah Aug. 2, 2016) (court "may use its inherent powers to sanction a party who circumvents the discovery process and the rules of engagement employed by the federal courts by improperly obtaining evidence before litigation and then attempting to use that evidence in litigation"); *cf. Coal. for an Airline Passengers' Bill of Rights v. Delta Air Lines, Inc.*, 693 F. Supp. 2d 667, 675 (S.D. Tex. 2010) ("hacking into a person's private computer and stealing personal correspondence would represent an intentional intrusion on the victim's private affairs . . . highly offensive to a reasonable person"). But even if,

as Defendants contend, the e-mails came from Strabala's work laptop, Strabala is the majority shareholder, legal representative, and design partner for 2DEFINE. Defendants do not explain how or why they are in possession of his work laptop. Nor do they cite any precedent for the Court to consider on whether their appropriation of information from Strabala's work computer was legally permissible because the computer was owned by the partnership and not Strabala personally and/or because Defendants had the ability as administrators of the partnership's computer system to view the laptop's contents without breaking into it. The Court is not prepared to summarily rule in Defendants' favor on those issues without development of the legal arguments supporting Defendants' position. *See Valley Air Serv. v. Southaire, Inc.,* 2009 WL 1033556, at *18 (N.D. Ill. Apr. 16, 2009) ("[t]he court is not required to construct arguments for a party").

While a conclusory foundational challenge made without any "sound reason to doubt" a document's authenticity, *Cejas,* 761 F.3d at 724, may be disregarded, Strabala's stated reasons for doubting the authenticity of the e-mails here are neither conclusory nor lacking in sound reason. This is particularly true given the nature of e-mails in general.

> Both email and electronic chats are faceless means of communication, with users identified by an email address or username. The recipient cannot, simply by looking at the email address or username provided in the document, readily identify the true identity of a message's sender. Even where the email address or username employed by the sender is an eponym, as likely is the case here, the sender's identity is not immediately discernable. In neither case can the recipient rely on the use of an email address or username to conclude that a third party has

> not made surreptitious use of an otherwise familiar account.

*United States v. Shah*, 125 F. Supp. 3d 570, 577 (E.D.N.C. 2015); *see also Jimena,* 2011 WL 2551413, at *6 ("'[w]hen the recipient of an e-mail attempts to prove that the message was authored by a particular individual whose name appears in the header, such self-identification by designated sender is insufficient to establish authorship.'") (quoting Paul R. Rice, ELECTRONIC EVIDENCE: LAW & EVIDENCE 348 (2d ed. 2008)); Note, *"God Mail": Authentication And Admissibility of Electronic Mail In Federal Courts,* 34 AM. CRIM. L. REV. 1387, 1388 (1997) (stating that "the increasing use of electronic mail in the United States, combined with the ease with which it can be forged, should at least give courts pause").

Direct proof of authenticity would consist of testimony by Strabala and Ding Qing, or someone who witnessed those individuals sending the e-mails, attesting that the documents in question are the actual, un-doctored emails sent by the authors. *See Fluker*, 698 F.3d at 999 (citing Mark D. Robins, *Evidence at the Electronic Frontier: Introducing E-Mail at Trial in Commercial Litigation*, 29 RUTGERS COMPUTER & TECH. L.J. 219, 226 (2003)). But indirect evidence of authenticity also may be sufficient. *Id.* Indirect evidence generally consists of testimony from "someone who personally retrieved the e-mail from the computer to which the e-mail was allegedly sent" together with other circumstantial evidence such as the e-mail address in the header and the substance of the email itself. *U.S. Equal Emp't Opportunity Comm'n v. Olsten Staffing Servs. Corp.*, 657 F. Supp. 2d 1029, 1034 (W.D. Wis. 2009). Defendants rely solely on indirect evidence of

authenticity consisting of their own affidavits in which they state that the e-mails were taken by them from what they claim to be Strabala's work computer.[13] Defendants are interested parties and the persons accused of theft. While Defendants state in their affidavits that they did not doctor the e-mails, given Strabala's theft charges and testimony that the e-mails do not appear the same as he remembers,[14] the Court finds that Defendants' testimony is insufficient by itself to establish an adequate foundation for admission. *See, e.g., United States v. Jackson*, 208 F.3d 633, 638 (7th Cir. 2000) (web postings excludable for lack of foundation because defendant had not shown they "actually were posted by the groups, as opposed to being slipped onto the groups' web sites by [defendant] herself, who was a skilled computer user"); *Brown v. Great-W. Healthcare*, 2007 WL 4730651, at *4 (N.D. Ga. June 8, 2007) (holding that "[t]here is simply insufficient evidence of [the e-mails'] authenticity . . . [to] overcome the lack of trustworthiness caused by the facts that: (1) [the plaintiff] found the questioned e-mails on her chair; (2) [she] had access to [the alleged sender's] private e-mail account; (3) neither party's expert could find the questioned e-mails on [the defendant's]

---

[13] The information Defendants originally provided to the Court about the source of the e-mails was vague. *See* R. 39 at 6 n.2 (stating that Defendants were "led to this new evidence . . . by Plaintiff's reference to the SOM case in his Opposition and Defendants' resulting review of the record in that case"). It was only after Strabala filed the Motion to Strike that Defendants admitted that the e-mails were retrieved by them from Strabala's work laptop.

[14] Strabala also states that there is no way he would have received the Ding Qing e-mail with the attached written interview because, by the date on the e-mail, "his email account was closed when the 2DEFINE website was shut down. The record does not contain sufficient facts for the Court to evaluate the accuracy of this statement.

computer system; and (4) the purported authors and recipients deny that they are authentic").

The Court acknowledges counsel's statement in Defendants' reply brief that they take allegations of evidence tampering seriously and that they investigated the evidence before submitting it to the Court by verifying through metadata that no tampering took place. *See* R. 45 at 5. The Court does not question counsel's sincerity, although the proper way to submit this information for purposes of laying an evidentiary foundation would have been with a sworn declaration or affidavit rather than in statements made in a footnote of the reply brief. In any event, counsel also are not neutral third parties, nor have they shown that they are computer experts qualified to attest to the e-mails' authenticity. Moreover, it would be unfair to accept their word in a footnote in a brief without, at the very least, allowing Strabala the opportunity to conduct his own investigation of the laptop on which Defendants claim to have found the e-mails and to which Strabala states he has not had access. This is particularly true given, as Strabala points out in his supplemental declaration (R. 46 at 3, ¶ 12), the metadata submitted to "prove" counsel's representations (attached as an exhibit to Defendants' response to the Motion to Strike, R. 45-4) is not attested to, does not reference any particular document, shows a date for "last printed" which is three months prior to the date of creation, and lists Defendant "Qiao Zhang" as the "author." For these reasons, the

Court concludes that Exhibits F and G have not been properly authenticated, and grants Strabala's Motion to Strike.[15]

## B. SUBJECT MATTER JURISDICTION

### 1. STANDARD OF PROOF

A challenge to a district court's subject matter jurisdiction is made under Federal Rule of Civil Procedure 12(b)(1). Rule 12(b)(1) motions come in two varieties: (1) facial attacks and (2) factual attacks. *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443-44 (7th Cir. 2009). Where a facial attack is made, the district court takes the allegations in the complaint as true, and merely questions the sufficiency of the pleading. *Id.* at 443. "In contrast, a factual challenge

---

[15] Even if the Court were to find that Defendants have provided a proper foundation for Exhibits F and G, the admissibility of those exhibits to prove the matters asserted by Defendants is questionable. The letter from Strabala to his wife is a privileged communication between husband and wife. *See* 735 Ill. Stat. Ann. 5/8-801. Defendants contend that Strabala waived the marital privilege by sending the letter via e-mail from his work computer. *See* R. 45 at 2-3 (citing, *inter alia*, *United States v. Hamilton*, 701 F.3d 404 (4th Cir. 2012)). Even if the computer was Strabala's work laptop as opposed to his personal laptop (a fact in contention), the evidence Defendants submit as proof of Strabala's waiver is a supplemental declaration by Zhang with an attached sample employment contract containing a written policy regarding the permitted use of company computers and confidentiality. *See* R. 45-1. Strabala denies that he ever signed such a contract, and there is no evidence to the contrary. Indeed, one would not expect that Strabala would have signed the employee contract because he is an owner of 2DEFINE through his partnership interest, not an employee. The article written about Strabala and attached to the Ding Qing e-mail presents a different evidentiary problem. Defendants offer the article as proof that Strabala actually said what the article claims he said, in other words, for the truth of the matters asserted. Defendants do not explain the basis for admission of this hearsay. At the very least, Defendants would have had to show that Strabala reviewed the article and did not make any corrections to it, in which case they might have been able to argue that he "adopted" the statements in the article that are attributed to him. But they have not done so. Therefore, at least at this juncture, the Court finds that the article also is inadmissible on substantive grounds.

lies where the complaint is formally sufficient but the contention is that there is *in fact* no subject matter jurisdiction." *Id.* at 444 (internal quotation marks and citation omitted) (emphasis in original). Zhang and Zhou submitted affidavits calling this Court's subject matter jurisdiction into question. Thus, they presented a factual challenge to the Court's subject matter jurisdiction.

"The presumption of correctness that we accord to a complaint's allegations falls away on the jurisdictional issue once a defendant proffers evidence that calls the court's jurisdiction into question. At that point, a court need not close its eyes to demonstrated jurisdictional deficiencies in a plaintiff's case and accord a plaintiff's unproven allegations greater weight than substantive evidence to the contrary." *Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 685 (7th Cir. 1998). Responding to the affidavits filed by Zhang and Zhou, Strabala submitted his own declaration. The competing affidavits/declarations demonstrated to the Court that the relevant jurisdictional facts were in dispute. For this reason, the Court directed the parties to conduct jurisdictional discovery and then file supplemental briefs. The Court has now had the opportunity to consider all of the evidence submitted by the parties, as well as the initial and supplemental briefs. Strabala, as the litigant claiming the right to the federal forum, bears the burden of proving subject matter jurisdiction. *Craig v. Ontario Corp.,* 543 F.3d 872, 876 (7th Cir. 2008). The standard is proof by preponderance of the evidence. *See Meridian Sec. Ins. v. Sadowski*, 441 F.3d 536, 543 (7th Cir. 2006) ("banish[ing] from our

lexicon" the oft-repeated standard "[r]easonable probability that jurisdiction exists").

### 2. ANALYSIS

Strabala alleges that this Court has jurisdiction over the complaint pursuant to 28 U.S.C. § 1332(a)(2), which provides for original jurisdiction in the federal district court over claims between "citizens of a State and citizens or subjects of a foreign state." The status of Zhang and Zhou as citizens of China, a foreign state, is undisputed. Therefore, the only issue is Strabala's status as a "citizen of a State." Strabala alleges that he is a citizen of Illinois. But Zhang and Zhou argue that, because Strabala lives in China, he is a citizen of the United States without being a citizen of any State. If Strabala is indeed "stateless," he may not invoke this Court's diversity jurisdiction under 28 U.S.C. 1332(a)(2). *See Sadat v. Mertes*, 615 F.2d 1176, 1180 (7th Cir. 1980) ("settled precedent establishes that a citizen of the United States who is not also a citizen of one of the United States may not maintain suit under [the diversity statute]").

### a. RULES FOR DETERMINING A PARTY'S CITIZENSHIP

"In federal law citizenship means domicile, not residence." *Am.'s Best Inns, Inc. v. Best Inns of Abilene, L.P.*, 980 F.2d 1072, 1074 (7th Cir. 1992) (citing *Gilbert v. David*, 235 U.S. 561 (1915)). Residence is where a person lives. An individual's domicile, on the other hand, "is the place where that individual has a true, fixed home and principal establishment, and to which, whenever that person is absent from the jurisdiction, he or she has the intention of returning." Wright & Miller,

13E Fed. Prac. & Proc. Juris., § 3612 (3d ed.); *see Texas v. Florida,* 306 U.S. 398, 424 (1939) ("Residence in fact, coupled with the purpose to make the place of residence one's home, are the essential elements of domicile."). "Domicile, therefore, has both a physical and a mental dimension." Wright & Miller, *supra*, § 3612; *see generally Midwest Transit, Inc. v. Hicks,* 79 Fed. App'x 205, 208 (7th Cir. 2003) (unpublished) (reversing district court's determination of citizenship because court failed to consider defendant's contacts with State in relation to his statements of intent regarding his citizenship). And, it "is more than an individual's residence, although the two typically coincide." Wright & Miller, *supra*, § 3612. Yet, a person can have multiple residences but only one domicile. "The very meaning of domicil is the technically pre-eminent headquarters that every person is compelled to have in order that certain rights and duties that have been attached to it by the law may be determined. In its nature it is one[.]" *Williamson v. Osenton*, 232 U.S. 619 (1914).

The Seventh Circuit has said that the test for domicile works well for cases in which residence coincides with intent, but is "becoming increasingly outdated as more people buy second or even third residences in different states." *Midwest Transit, Inc.,* 79 Fed. App'x at 208. In the latter situation, "the test can turn into a complex, even arbitrary, inquiry into an individual's intent." *Id.* (citing *Galva Foundry Co. v. Heiden*, 924 F.2d 729, 730 (7th Cir. 1991)). As a result of the difficulties inherent in the domicile inquiry, courts primarily look at intent through objective factors. *See Sadat*, 615 F.2d at 1181 ("[i]ntent is a state of mind which must be evaluated through the circumstantial evidence of a person's manifested

conduct") (internal quotation marks and citations omitted). Some of the objective factors relevant to a person's intent include "current residence, voting registration and voting practices, location of personal and real property, location of financial accounts, membership in unions and other associations, place of employment, driver's license and automobile registration, and tax payments." *Midwest Transit, Inc.,* 79 Fed. App'x at 208. "The existence of one or more of these factors may weigh in favor of a finding of citizenship, but no single factor is conclusive." *Id.* For this reason, each case necessarily turns on its own unique combination of facts.

Before examining the evidence in the record relevant to Strabala's domicile, the Court notes that it finds extremely troubling Strabala's refusal to provide Defendants with any pre-2014 discovery on the ground that jurisdiction is determined as of the date on which the lawsuit is filed. *See Denlinger v. Brennan*, 87 F.3d 214, 216 (7th Cir. 1996) ("Jurisdiction depends on citizenship at the time a case begins."). While the issue for the Court is Strabala's domicile on February 9, 2015, which is the date Strabala filed this lawsuit, the facts relevant to determining his domicile on that date relate back to Strabala's intent when he moved to Houston in 2006 and then to Shanghai in 2008. Thus, jurisdictional discovery should have encompassed the entire time period between 2006 and 2015, and Strabala's position to the contrary was frivolous. *See, e.g., Perry v. Pogemiller,* 16 F.3d 138, 140 (7th Cir. 1993) ("Perry's hyper-technical interpretation of assessing domicile [in which he argued that the inquiry is restricted to information about that party's activities on the date suit is filed] is totally lacking in support and in substance and thus, an

appeal based on this argument was destined to fail. . . . Therefore, we conclude that sanctions are appropriate[.]").

Zhang and Zhou could have moved to compel pre-2014 discovery, but they did not. Even so, the Court will infer from Strabala's failure to provide pre-2014 discovery that any documents from this time period, had they been produced, would have pointed to Strabala's domicile being somewhere other than Illinois. In addition, the Court will accord little to no weight to documents submitted by Strabala that concern a time period after the date on which the complaint was filed, finding that such documents are more likely to show a post-filing attempt by Strabala to create jurisdiction rather than a bona fide pre-existing intent regarding his domicile.[16]

---

[16] Like his refusal to provide pre-2014 discovery, Strabala's behavior at his deposition also is troubling to the Court. For example, Strabala was asked "what brings you to Chicago this week," to which he replied "I think it was a 747." R. 65-2 at 5 (Strabala Dep. 11-12). When asked "[w]hen did you arrive in Chicago," he responded "37 hours after I left Shanghai." *Id.* Even if intended as mere quips, these responses were not appropriate for a deposition. Strabala also responded inappropriately to questions by defense counsel seeking to determine the last time he had been in Chicago. Indeed, the transcript on this point reads like an Abbott and Costello routine, as the following illustrates:

> Q. And before the trip to Chicago that you are on right now, when was the last time you were in Chicago? A. At this time I can't remember. Q. Was it more than a year ago? A. At this time I can't remember. Q. Was it more than two years ago? A. At this time I can't remember. Q. You can't remember whether before this week or the last two weeks you've been in Chicago? A. I think that's what I said. Q. Okay. So it's not the case that you come to Chicago at least once a year? A. No, I try to come to Chicago as much as I can. Q. I didn't ask you that. I asked you whether it is the case that you don't always come to Chicago at least once a year? A. I don't understand the

Notwithstanding the negative inference and discounting the post-February 9, 2015 evidence submitted by Strabala, the Court concludes that the preponderance of the evidence still supports subject matter jurisdiction in this case. In reaching this conclusion, the Court has relied on the undisputed facts in the record,[17] evaluating those facts in light of the well established principle that "[a] domicile

> question. It's too confusing. Could you simplify it? Q. I will try. Before the trip that you were engaged in here in Chicago presently and we are in Chicago during this deposition, your testimony is that you can't recall the last time you were in Chicago, correct? A. No. Q. Please tell me what's wrong with my question. A. I said at this time I can't remember. Q. Do you draw a distinction between remember and recall? A. Not really. . . . Q. Right. Well, I also asked you whether it was in the last year, within the last two years—A. And I said I can't remember. . . . Q. And are you on any pharmaceuticals or other substances that would affect your ability to remember the last time you were in Chicago that you are aware of? A. No, and I didn't say I can't remember the last time I was in Chicago. I can't remember the last couple years the exact dates I was in Chicago.

*Id.* at 5-6 (Strabala Dep. 13-15). After this initial exchange, defense counsel for the most part was able to pin Strabala down regarding his previous trips to Illinois. It appears that those trips have been infrequent over the last five years with no visits at all in 2015.

[17] Had the facts on which the Court relies herein for finding subject matter jurisdiction been disputed, an evidentiary hearing would have been required, particularly given that concerns have been raised by both sides as to the other side's credibility. Although the record contains some factual disputes—most notably as to the frequency and dates of Strabala's visits to Chicago and where he files taxes—those disputes are more superficial than real, and the Court's ruling in any event does not depend on any of those matters. In addition, Defendants have not challenged Strabala's declaration testimony or his written discovery responses, nor have they requested the Court to conduct an evidentiary hearing. Therefore, in the interest of avoiding further delay, the Court has chosen to decide the current motions on the basis of the submitted record.

once existing continues until another is acquired." *Desmare v. United States*, 93 U.S. 605, 610 (1876); *see Sadat,* 615 F.2d at 1181 (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS, § 19 (1971)); Wright & Miller, *supra,* § 3612 (the rule that an established domicile continues until a new one is acquired "represents the conflicts of law solution to the problem of locating the domicile of an individual" who "pulled up stakes" from his former domicile "but either has not arrived physically at a new one or has arrived but has not yet formulated an intention to remain there for the indefinite future").[18]

It is undisputed that Strabala was domiciled in Illinois from roughly 1987 or 1988 until at least March 2006. Therefore, for Illinois to no longer be Strabala's domicile, there must be evidence not only that Strabala physically resides at a new location but that he does so with the "intention to remain there indefinitely, or, as some federal courts articulate it, the absence of any intention to go elsewhere." Wright & Miller, *supra*, § 3613. Zhang and Zhou argue that the evidence overwhelming shows that Strabala is now domiciled in China. But the Court concludes otherwise, finding that the objective evidence of Strabala's intent to maintain his previously established domicile in Illinois as against his residential status, combined with Strabala's declaration regarding his domiciliary intent, show

---

[18] The rule regarding the continuation of an established domicile is more than just an evidentiary presumption in favor of an individual's old, established domicile. It is a substantive rule premised on "a judicial policy determination that in ascertaining diversity jurisdiction in a highly mobile society there is a need to fix domicile with some reasonable certainty at the threshold of litigation." *Gutierrez v. Fox*, 141 F.3d 425, 428 (2d Cir. 1998).

that Strabala did not relinquish his domicile in Illinois despite his subsequent moves to Houston and then Shanghai.

**b.    STRABALA'S MOVE TO HOUSTON**

The following facts about Strabala's move to Houston are essentially undisputed.[19] In 2006 when Strabala and his wife left Chicago for Houston, they did not sell the Lake Shore Drive Condo or move any of their furniture out of it. For the first six to eight months, they lived in an apartment provided to them by Gensler. Although they later moved into a condominium they purchased in downtown Houston, they never brought their belongings from Chicago. Instead, they purchased all new furnishings in Houston. In addition, Strabala's wife spent about half her time in Chicago and half in Houston, while Strabala spent about fifty percent of his time in Shanghai, forty percent of his time in Houston, and ten percent of his time in Chicago. After Gensler was awarded the Shanghai Tower design contract, Strabala needed to spend most of his time in Shanghai. Strabala dislikes air travel, so he began living in Shanghai. At that point, which was before his employment with Gensler terminated, Strabala and his wife moved all of their newly purchased furnishings out of the Houston condominium and sent them to the

---

[19] Even if Strabala did acquire a new domicile in Texas when he moved to Houston in 2006, alien diversity jurisdiction still would exist in this case so long as Strabala did not later give up his Texas domicile when he moved to Shanghai. Therefore, it may seem unnecessary to analyze whether Strabala gave up his Illinois domicile in favor of Texas. In fact, however, such an analysis must be conducted, both because Strabala expressly disavows relying on Texas as his state of domicile, *see* R. 65-2 at 4 (Strabala Dep. 9), and because the evidence regarding Strabala's intent when he moved from Houston to China cannot adequately be evaluated without also considering Strabala's previous intent when he moved from Chicago to Houston.

Lake Shore Drive Condo in Chicago. They then rented out their Houston condominium. Since 2008, Strabala has been back to Houston on only one occasion, which was in 2011, after his employment with Gensler terminated, when he attended the opening of the Houston ballet. He stayed at a hotel for that trip because his condominium was leased. While Strabala and his wife still own the Houston condominium, it has been leased since 2008 and for sale since November 2014. The Lake Shore Drive Condo, on the other hand, has never been leased for more than a few days or weeks at a time, nor has it ever been listed for sale. Strabala states that he has no intention of ever selling it.

These facts are similar to those in *Ziskind v. Fox*, 2010 WL 3516117 (N.D. Ill. Sept. 1, 2010). The plaintiff in that case was born and primarily lived in Pennsylvania. *Id.* at *2. She moved to Chicago in November 2003 to organize a series of conferences for a Pennsylvania corporation she helped found. Her intent in going to Chicago was to expand the company and to then either return to Pittsburgh or relocate to Washington, D.C. While living in Chicago, she operated the company out of either an office or her apartment. Her apartment was a rental with a lease term of no more than one year at a time. She testified that, since moving to Chicago, she had visited Pennsylvania only once or twice a year for three to four days at a time, and that, when she visited Pennsylvania, she stayed in hotels. Although she opened a bank account in Chicago, her primary bank accounts remained with banks in Pennsylvania. *Id.* The defendants contended that Ziskind was an Illinois citizen, based on her residence in that state for close to seven years, her interviewing for

employment in and operating her business from Chicago, her joining a synagogue and a chamber music organization there, and her opening of a bank account there. *Id.* at *3. The district court rejected these contentions, however, holding that the facts cited by the defendants were "not sufficient to undermine Ziskind's contention, supported by her affidavit and attachments, that she remains, for purposes of diversity jurisdiction, a Pennsylvania citizen." *Id.*[20]

To be sure, the facts in *Ziskind* are not identical to the facts here. For instance, the plaintiff in *Ziskind* had a valid Pennsylvania driver's license, her car was titled, registered, located, and insured in Pennsylvania, and she was registered to vote in Pennsylvania and in fact had voted there while living in Chicago. *Id.* Strabala, on the other hand, has a Texas driver's license, his car is or was titled and registered in Texas (although it is apparently now located in Chicago),[21] and his

---

[20] *See also Gutierrez,* 141 F.3d at 428-29 (holding that the plaintiff's domicile remained in New Jersey for purposes of a lawsuit filed in 1996, even though as of the filing he "worked in New York, banked in New York, and had a girl friend who lived in New York with whom he stayed from time to time," because he did not form the intent to stay in New York until sometime in 1997); *Scoggins v. Pollock*, 727 F.2d 1025, 1028 (11th Cir. 1984) (although the plaintiff left Georgia not intending to return there, "she was undecided about her future plans" and ended up residing in South Carolina solely to pursue her graduate studies; she therefore lacked the intent to acquire a new domicile in South Carolina, which meant that "Georgia remained [her] domicile for diversity purposes"); *Spanos v. Skouras Theatres Corp.*, 235 F. Supp. 1 (S.D.N.Y. 1964), *aff'd in relevant part and rev'd in part on other grounds*, 364 F.2d 161, 164 (3d Cir. 1966) (plaintiff did not give up California domicile despite having sold his residence there and moved to New York where he worked as an attorney for close to ten years because his intent to maintain his California domicile was shown by the facts that he always kept a law office there and never applied to become a member of the New York bar).

[21] Strabala states that his car was originally located in Illinois, driven to Texas when Strabala moved there, and then shipped back to Illinois when Strabala moved to Shanghai. But his testimony about the car originally being located in Illinois

voter registration status is unclear on the current record.[22] While relevant, the Court does not view these facts as dispositive in this case. *See, e.g., Webb v. Banquer*, 19 F. Supp. 2d 649, 654 (S.D. Miss. 1998) (fact that decedent obtained a Mississippi driver's license and paid Mississippi taxes does not contradict his stated intention of being domiciled elsewhere because he had no choice but to do those things); *Herzog v. Herzog*, 333 F. Supp. 477, 478 (W.D. Pa. 1971) ("little weight can be given to the fact that plaintiff acquired an operator's license and car registration in New York, since non-residents undertaking extensive stays in New York are obliged by law to obtain those licenses"); *Messick v. S. Pa. Bus Co.*, 59 F. Supp. 799, 801 (E.D. Pa. 1945) ("Plaintiff's registration of his automobile in Pennsylvania is inconclusive in establishing his domicile.").[23]

Defendants argue that Strabala's purchase of a condominium in Houston and taking of a homeowner's exemption on it support a finding that he intended to make Texas his home after moving there. In addition, Defendants cite to the facts that,

---

seems inconsistent with his other testimony that the car has never been registered in Illinois.

[22] Strabala states in his declaration that he has always been registered to vote in Illinois as well as active in the voting process. Courts have found that "voting in a state raises a presumption of citizenship in that state." Wright & Miller, *supra,* § 3612. The Court declines to rely on this fact here, however, because Strabala has only submitted evidence of his 2016 voter registration card and has declined to provide discovery regarding any dates prior to 2014.

[23] Zhang and Zhou point out that Strabala has maintained his Texas driver's license to this day, despite having moved from Texas and despite denying an intent to make Texas his domicile. Strabala testified it was convenient to keep that license while living in Shanghai because it was renewable by internet, and the Court finds that explanation credible.

when his employment with Gensler terminated, Strabala applied for unemployment benefits in Texas and that he also claimed his Texas address as his residence on various tax forms. The Court does not view any of these facts as conclusive of Strabala's domiciliary intent either. Strabala contends that he purchased the Houston condominium for convenience, and that his wife made a mistake when she claimed a homeowner's exemption on it. He claims that he filed for unemployment benefits in Texas because that is where his most recent job at the time he became unemployed was located. These are reasonable explanations unrelated to an intent to make Texas his home. Strabala does appear to have acted inconsistently with regard to taking a homeowner's exemption on his two condominiums,[24] and he likely used his Houston address in his tax filings.[25] But again the Court finds these facts are not dispositive. The Court takes note that Texas does not have a state income tax while Illinois does. The Court concludes that Strabala's conduct in taking a homeowner's exemption on his Texas condominium and his probable use of his Texas address on tax documents may be indicative of an intent to avoid taxes but do not establish an intent to make Texas his home in light of other evidence in

---

[24] Strabala states in his declaration that he "regularly complete[s] a 'homeowners exemption' form for his Chicago co-op," R. 33-1, (¶ 15), but he attaches as proof only his 2016 Illinois homeowner's exemption form. The record shows that he likely took a homeowner's exemption on his Houston condominium in the years 2006 through 2008.

[25] The record shows that Strabala used the Houston address on a tax form for S&W. *See* R. 41-2 at 35. The Court is unable to determine for certain whether Strabala did the same for any tax documents for years prior to 2014 because Strabala refused to produce that information in discovery, and the Court therefore presumes that he did so.

the record regarding domicile. *See, e.g., Galva Foundry Co.*, 924 F.2d at 730 (while the plaintiff's representations regarding his residency status made on Florida tax forms had an "aura of fraud" about them, they did not effect a change of his domicile from Illinois to Florida because their purpose, *i.e.,* to avoid Illinois taxes, was unrelated to domicile); *Al-Turki v. Klopp*, 2013 WL 752931, at *5 (S.D. Ind. Feb. 27, 2013) (the fact that the defendant stated in tax forms and loan documents that her primary residence was in Indiana suggests that she "misrepresented herself . . . in order to obtain a tax benefit," not that she was domiciled in Indiana); *see also DTC Telecom, L.L.C. v. ISP Techs., Inc.*, 2002 WL 31553932, at *3 n.4 (N.D. Tex. Nov. 15, 2002) ("citizenship is a matter of federal common law and does not require specific compliance with the laws of a specific state").

Defendants also cite to statements by Strabala purportedly made to a Houston reporter who wrote an article about Strabala, as well as the response Strabala gave in 2012 at his deposition in the SOM litigation when he was asked where he lived (he first gave his address in Shanghai, then, when asked for an address in the United States, gave his Houston address, and then, after further pressing by opposing counsel, gave his Chicago address). These statements, however, are not necessarily indicative of his intent regarding his domicile because they were made in an unrelated context. *See* Wright & Miller, *supra*, § 3612 ("declarations made for purposes other than the pending lawsuit are not conclusive" and are "open to a party to impeach . . . on such grounds as that they were mistaken, misinformed, or made for entirely different purposes or on the basis of an

erroneous understanding of the controlling legal principles"). In particular, it is no surprise that Strabala would emphasize his ties to the Houston community in comments he made to a Houston reporter for an article in a Houston newspaper. It also is likely that Strabala gave his Houston address when asked in the SOM litigation where he lived because of his continuing desire to avoid Illinois taxes by claiming residency in Texas instead. In any event, Strabala was asked at the deposition where he lived, not where he was domiciled, and it is an admitted fact that Strabala currently lives in Shanghai and, immediately before that, lived in Houston.

The Court finds other facts more significant on the question of domicile than those cited by Defendants. In particular, when he moved to Houston, Strabala maintained his personal residence in Chicago and did not rent it out other than for a few days or weeks at a time. *See Bangaly v. Baggiani*, 2009 WL 2475116, at *2 (N.D. Ill. Aug. 11, 2009) (holding that the defendant was still domiciled in Illinois despite moving two years earlier to Indiana "to live until he retires with a woman named Sophie who he claims will be his future wife," because, among other things, he continued to own a home in Illinois and to list his Illinois address on various forms); *Tanon v. Muniz*, 312 F. Supp. 2d 143, 149 (D.P.R. 2004) (holding that plaintiff's domicile remained in Puerto Rico despite her spending most of her time in Florida because "[s]he never sold her residence in Puerto Rico nor rented it"). Further, Strabala and his wife left virtually all of their personal belongings in Chicago when they moved to Houston, and, when Strabala needed to be in Shanghai

full time, they sent all of their belongings in Houston to their Chicago residence and rented out the Houston condominium. The Court finds these last facts particularly compelling of an intent to maintain Chicago as the place of domicile. *See Texas*, 306 U.S. at 425-26 ("all the circumstances of his life indicated that his real attitude and intention with respect to his residence there were to make it his principal home or abiding place to the exclusion of others," as "clearly indicated by the fact that it was the place most associated with his family history . . . by his assembling there the furnishings and objects closely associated with his earlier homes and with his family life"); *Webb,* 19 F. Supp. 2d at 654 ("Most of the personal property ('belongings') of the Webb family were stored in Texas, and the Webbs brought very few personal belongings with them from Texas to Mississippi.").

These objective facts support Strabala's explanation that, when he was hired by Gensler to work in Houston, he was uncertain about how his new job would work out and therefore he did not move there with the intention of making it his permanent home. Defendants are incorrect when they argue that Strabala's statement of intent for purposes of this litigation should be disregarded completely. While Strabala's testimony is self-serving, it nonetheless is "evidence of the intention requisite to establish domicile." *Texas,* 306 U.S. at 425. Statements of intent are entitled to little weight only if they conflict with the objective facts in the record. *Id.* Otherwise, the court may choose to give them some or even "heavy . . . weight." *Goode v. STS Loan & Mgmt., Inc.,* 2005 WL 106492, at \*7 (D. Md. Jan. 14, 2005) (internal quotation marks and citation omitted). Strabala's statement of

intent with regard to his move to Houston is buttressed, not contradicted, by his course of conduct after moving to Houston. Therefore, the Court may rely on it to tip the balance in his favor where, as here, there are objective facts pointing the Court in both directions. *See DTC Telecom, L.L.C.*, 2002 WL 31553932, at *3 n.5 ("where the evidence is relatively balanced, expressed intent can be taken into consideration"); *see also Washington v. Hovensa LLC*, 652 F.3d 340, 346-47 (3d Cir. 2011) (remanding for further findings because, among other things, the district court improperly disregarded the plaintiff's affidavit stating that, although she was living and working in the Virgin Islands, she intended to return to Texas); *Ziskind*, 2010 WL 3516117 (relying on the plaintiff's stated intent to maintain her Pennsylvania domicile where, although there was evidence on both sides, the plaintiff could point to objective conduct supporting that intent); *Webb,* 19 F. Supp. 2d at 654 ("the evidence confirms Darren Webb's statement that neither he nor his wife ever formed the necessary intent to establish a legal domicile in Mississippi").

Finally, the Court rejects Defendants' argument, based on the *Sadat* case, that Strabala moved to Houston and now is trying to reassert an Illinois domicile without having re-established residency there. In *Sadat*, the plaintiff sold his residence in Pennsylvania, took all his belongings with him when he moved, and notified the U.S. Embassy that Beirut was his permanent overseas residence. These objective facts demonstrated that the plaintiff had given up his domicile in Pennsylvania when he moved to Beirut, so that, when he later was evacuated to Egypt, his stated intention of moving back to Pennsylvania without having ever re-

established residency there was insufficient to establish that he was domiciled in Pennsylvania. Here, Strabala maintained his Chicago domicile by, among other things, keeping his Chicago residence. In other words, he never abandoned his Illinois domicile when he moved to Texas and therefore did not need to re-establish residency there in order to be considered an Illinois citizen.

### c.     STRABALA'S MOVE TO SHANGHAI

Zhang and Zhou argue that, because Strabala has lived and worked in Shanghai continuously since at least 2008, his intent must be to make Shanghai his permanent home. But, as already noted, physical presence alone does not determine one's domicile, and in fact it is well recognized that there are "certain classes of litigants who do not reside where they are domiciled but nonetheless maintain their domiciles despite protracted periods of residence elsewhere," including, for example, military personnel, prisoners, out-of-state students, and governmental or organizational officials. Wright & Miller, *supra,* § 3612. Strabala seeks to fit himself within this category of people who do not reside where they are domiciled when he argues the following:

> The only reason I spend much of my time in China is because China is a significant market for the kinds of architecturally important buildings that I have the reputation and expertise to design. Clients want frequent access to their chief architect for their jobs. As a result, I had a choice as to how to conduct my business: I could travel every 2-3 weeks to Asia and spend more time in Chicago, which would increase costs and force me to live in a permanent state of jet lag, or engage in less traveling and spend more time in China servicing the clients for my work. I have chosen the latter as the most sensible way of running my architectural business.

R. 65-3 at 9-10 (¶ 42); *see also id.* at 64 (¶ 17) ("It is only because my principal clients are located in Asia and China that I am spending a good deal of time in China."). Strabala further states with regard to his current residence in Shanghai that he has "every intention of retaining [his] primary residence and permanent home in Chicago." *Id.* at 10 (¶ 43).

Courts have held that a person who resides elsewhere because of his job may nevertheless maintain his previous domicile. *See, e.g., Washington*, 652 F.3d at 346-47 (where district court found that the plaintiff had acquired a new domicile in the Virgin Islands because she moved there to work, was physically present there most of the time, and centered her "business and social life" there; reversed and remanded on appeal because, although those facts cited by the district court pointed towards a new domicile in the Virgin Islands, the district court failed to evaluate them in light of the presumption in favor of the plaintiff's previously established domicile in Texas); *Persinger v. Extendicare Health Servs., Inc.,* 539 F. Supp. 2d 995, 996 (S.D. Ohio 2008) (concluding that "the decedent's actions while in Ohio are more consistent with a person who is on an extended or protracted absence from his domicile" than one who intends to change his domicile); *Jardine v. Intehar*, 213 F. Supp. 598, 600 (S.D.W. Va. 1963) ("A change in residence for the purpose of seeking employment or for convenience in working conditions does not, without more, dictate a change in domicile.") (internal quotation marks and citation omitted); *Harton v. Howley*, 155 F. 491, 493 (W.D. Pa. 1907) (plaintiff did not give up former domicile by residing in place where his "work lies").

Defendants make several arguments for why the Court should find that Strabala is domiciled in China, but none of them are persuasive. First, Defendants contend that when a person moves overseas, he gives up his previous domicile in the United States. In fact, however, "[m]ore evidence is required . . . to establish a change of domicile from one nation to another than from one state to another." *Maple Island Farm v. Bitterling*, 196 F.2d 55, 59 (8th Cir. 1952) (quoting 28 C.J.S., Domicile, § 16); *see also* Wright & Miller, *supra*, § 3612 (courts apply "th[e continuing domicile] rule" to "assure[ ] that a United States citizen will not be denied access to the federal courts on the ground that she has no domestic domicile and, hence, no state citizenship for subject matter jurisdiction purposes"); *id.*, § 3613 ("a United States citizen may acquire a domicile in a foreign country under the principles discussed above," but the rules regarding domicile are intended to prevent that from happening "except in very limited circumstances").

For example, in *Kaiser v. Loomis*, 391 F.2d 1007 (6th Cir. 1968), the plaintiff lived in Ethiopia as a missionary doctor on a basis that the court said was obviously temporary given his living situation there. Prior to that he had lived on a temporary basis in various other states. The Sixth Circuit rejected the argument that the plaintiff was stateless for purposes of diversity jurisdiction, holding that he became an Illinois citizen when he was born to parents who were domiciled there and that he continued to have that citizenship despite having moved from Illinois because he had yet to acquire any new domicile. *Id.* at 1009. And, in *Coury v. Prot*, 85 F.3d 244 (5th Cir. 1996), the Fifth Circuit affirmed the district court's finding that, although

the defendant had physically moved himself and his family from Texas to France, he did so "to avoid transatlantic commuting" and "the evidence failed to show an essential requisite of change in domicile, *viz.*, that he formed an intention . . . to remain in France indefinitely." *Id.* at 252. The Fifth Circuit concluded that, "[i]n view of [the defendant's] repeated statements that he and his wife did not intend to stay in France indefinitely and that they always intended to return to Texas, . . . the district court's findings were not clearly erroneous." *Id.*[26]

The cases cited by Defendants, on the other hand, turn on the unique facts in each rather than any broad-based rule regarding moving overseas. For example, in *Sadat,* 615 F.2d 1176, the court held that the plaintiff was domiciled in Egypt where he lived because, among other things, he had dual American and Egyptian citizenship, his mother lived there, he owned a house there where he kept his furniture, books, records and valuables, he paid real estate taxes there, his children went to school there, he had an Egyptian driver's license, he  maintained an Egyptian checking account, and his affidavit stated that he considered himself a resident of Egypt where he was born and raised. *Id.* at 1181. These facts are starkly different from those here, where Strabala has no family ties to China, his wife spends half her time in Chicago, he has virtually no personal belongings in China,

---

[26] *See also United States v. Knight*, 299 F. 571, 573-74 (9th Cir. 1924) ("An American citizen does not become a permanent  resident of a foreign country by simply taking employment there with an American firm, however long his employment may continue."); *Liakakos v. CIGNA Corp.*, 704 F. Supp. 583, 586-87 (E.D. Pa. 1988) (plaintiff did not give up his domicile in California when he was transferred to Greece by his employer, because, even though he has not yet returned to California, he continues to own and maintain his home, his bank account, his voter registration, and his driver's license there).

he has lived at all times while in China in either a furnished efficiency apartment or hotel room, he owns no car or real property in China, and, in addition to his Chinese bank accounts and credit cards, he also maintains bank accounts in Illinois.

Defendants also cite *Newell v. O & K Steel Corp.*, 42 Fed. App'x 830 (7th Cir. 2002) (unpublished) (per curiam), in which the plaintiff contended "that Louisiana [was] his domicile because he had previously resided there, his mother currently resides there, he 'stores goods' there, and he intends to return there at some time in the future." *Id.* at 833. These contentions were held to be rebutted by the facts that the plaintiff (1) resided in Japan; and (2) asserted in his complaint that his hometown was *not* Louisiana but Chicago (where there would not be diversity jurisdiction). The superficial similarities between *Newell* and this case to which Defendants cite—(a) that the plaintiff remained in Japan "despite his employment terminating [ ] and his visa expiring [ ]"; (b) that he "could not be present in Chicago to pursue his lawsuit because of visa concerns that he would not be able to return to Japan"; and (c) that he "filed this lawsuit only after first pursuing relief unsuccessfully in Japan's court system," *id.*—are neither controlling of, nor necessarily even relevant to, the domicile inquiry. Moreover, the court in *Newell* did not consider or apply the continuing domicile rule, and Strabala's ties to Illinois are much more significant than the meager ties the plaintiff in *Newell* had to Louisiana.

The district court cases Defendants cite are similarly distinguishable. In *Novel v. Zapor*, 2013 WL 1183331 (S.D. Ohio Mar. 21, 2013), the court based its decision that the plaintiff was not domiciled anywhere in the United States on the

facts that he had resided in Thailand for approximately ten years where he worked as an immigration attorney, he owned a company in Thailand, he had a sister living there, he was married to a Thai citizen, and most of his personal belongings were there. *Id.* at *3. His only connections to New York and California (the two places where he argued he was domiciled), were that his father and another sister lived in California, he stored "some personal items" in California, and he claimed to have a residence in New York. *Id.* Unlike Strabala, the plaintiff in *Novel* never lived in one of his claimed domiciles (California), and the court doubted he really owned a residence in the other (New York) even though he said he did. *Id.* at *8; *see also Segen v. Buchanan Gen. Hosp., Inc.*, 552 F. Supp. 2d 579, 583-84 (W.D. Va. 2007) (where the plaintiff had been living and working in England continuously for approximately nine months, court rejects argument that he was domiciled in either New York or Florida; plaintiff offered no evidence whatsoever to support his alleged connection to Florida and his only connection to New York was that he used to live and work there, had paid spousal and child support there, and once voted there over ten years ago).[27]

---

[27] Two other cases cited by Defendants actually support Strabala's position here because, in the face of conflicting evidence regarding domicile, the courts in those cases credited the statements of intent of the party whose citizenship was at issue (the defendant in both). *See Al-Turki*, 2013 WL 752931, at *4-5 (where the plaintiffs were foreign citizens attempting to sue the defendant in federal district court in Indiana based on her alleged domicile there, court holds that, notwithstanding she had a home in Indiana where her husband lived and she visited frequently, the defendant was domiciled in Kuwait where she maintained permanent residency status and dual citizenship with the United States and where *she testified she intended to remain living for the foreseeable future*); *Filter Specialists, Inc. v. Xin Li,* 2008 WL 2783266, at *3-6 (N.D. Ind. July 16, 2008) (holding that the defendant was

Second, the Court also rejects Defendants' argument that Strabala has extensive connections to China which evince his intention to remain there. Aside from the fact that Strabala currently lives and conducts business in China, the only evidence of Strabala's extensive connections to China to which Defendants cite is the facts that Strabala is a well-known figure in the Chinese architectural community and uses a Chinese name for business in China, and statements about his residency in Shanghai attributed to him in local newspaper and/or magazine articles. The Court does not think Strabala's prominence in China or his use of a Chinese name for business in China are indicative of anything other than his business purpose for being there. And even if the Court can consider the newspaper and/or magazine articles as proof that Strabala made the statements attributed to him in them,[28] like Strabala's statements to the Houston reporter, they easily could have been motivated by Strabala's desire to please the local audience to whom he was speaking. The Court therefore does not view those statements as particularly strong evidence of Strabala's intent regarding his residency in China, and certainly not as strong as Strabala's actual living situation in China. The Court finds it especially indicative of Strabala's intent *not* to reside permanently in Shanghai the

---

domiciled in China, where he originally was from, where he currently lived, where he had a Chinese bank account, a Chinese driver's license, and a long-term Chinese work visa, and where *he stated he intended to remain indefinitely to be near his parents in order to care for them in their old age*).

[28] Zhang and Zhou both state that they personally heard Strabala make some of the statements in the articles or interviews. That fact, however, lays a foundation only for Zhang and Zhou to testify about what they heard; it does not necessarily overcome an independent hearsay objection to the articles themselves.

facts that (1) he lives in a furnished hotel with a lease of one year or less and owns no real property, automobile, other means of transportation, and very few items of personal property (a desk and a computer) in China, *see, e.g., Persinger*, 539 F. Supp. 2d at 998 ("The temporary nature of the housing . . . further undermines any positive determination that the decedent intended to remain in Ohio."); (2) he is in China on a work permit that must be renewed annually; and (3) his wife spends six months out of the year in Chicago, *see, e.g., Kenosha Unified Sch. Dist. v. Stifel Nicolaus & Co.*, 607 F. Supp. 2d 967, 975 (E.D. Wis. 2009) (finding domicile to be established by the presence of the plaintiff's wife and children in a home built to be their primary residence).[29]

Third, Defendants point to the fact that Strabala has no definite date of return from Shanghai. The contention that a definite return date is required is not supported in the law. *See* Wright & Miller, *supra,* § 3613 ("even with a showing that a person is maintaining a new residence *and will do so for an indefinite period*, he may *not* be held to have changed domicile when he is away from the former home for a limited purpose—for example, to obtain medical care, *to pursue employment*, or to serve in an elective or appointive office") (emphasis added). For example, in *Washington,* 652 F.3d at 342, the court held that the plaintiff's testimony that her

---

[29] The only evidence in the record on where Strabala's wife spends her time is Strabala's testimony that she lives six months in Shanghai with him and six months in Chicago. Defendants' affidavits state that Strabala's wife lives with him in Shanghai, but the Court concludes that those statements are not inconsistent with Strabala's more specific statement that she splits her time between Shanghai and Chicago. In any event, if there is an inconsistency, the Court credits Strabala's testimony, who obviously would have more particularized knowledge of the exact location of his wife at any given time than either of Defendants.

work assignment in the Virgin Islands "was for an indefinite period of time" was not dispositive of whether she had established a new domicile in the Virgin Islands. And, in *Coury,* 85 F.3d at 251, the court also held that the fact that the defendant did not know when he would be able to return to the United States from France did not preclude a finding that he never changed his domicile to France. *See also Maple Island Farm*, 196 F.2d at 58 (Domicile "'does not follow from mere indefiniteness of the period of one's stay. While the intention to return must be fixed, the date need not be; while the intention to return must be unconditional, the time may be, and in most cases of necessity is, contingent.'") (quoting *District of Columbia v. Murphy*, 314 U.S. 441, 455 (1941)); *Jardine*, 213 F. Supp. at 600 ("A change of domicile does not depend so much upon the intention to remain in the new place for a definite o[r] indefinite period, as upon its being without an intention to return.") (internal quotation marks and citation omitted).[30]

---

[30] Zhang and Zhou argue that "a floating intention to return at some future period" is insufficient for purposes of maintaining a previously established domicile. R. 64 at 5 (quoting *Gilbert,* 235 U.S. at 569-70). The Supreme Court made the "floating intention" comment in *Gilbert*, however, only after finding that the facts showed that the plaintiff had indeed relinquished his domicile in Michigan when he moved his family to Connecticut and bought a house there where he had lived for the past twenty years. A floating desire to return to Michigan someday could not by itself preserve a domicile in that state when the facts showed the domicile had been previously abandoned. *See also Foroughi v. Am. Airlines, Inc.,* 2011 WL 5979716 (S.D.N.Y. 2011) (also cited by Defendants) (where the plaintiff moved to Canada three years before the complaint was filed, and, notwithstanding her stated intention to return to New York someday, did not offer any facts to suggest that she did not give up her New York domicile when she moved). Nothing in *Gilbert* suggests that the "floating desire" language was intended to impose a separate, independent requirement of a definite return date.

Finally, Defendants contend that Strabala's "remaining ties to Illinois are almost non-existent." R. 56 at 8. The Court rejects this characterization of the evidence, however, for reasons that have already been explained, namely that Strabala has owned the Lake Shore Drive Condo continuously since 1999, he has never sought to lease it out other than for days or a few weeks at a time, and his wife spends six months of the year there. In addition, Defendants ignore other contacts Strabala has maintained with Illinois, such as the fact that Strabala incorporated his company, S&W, as an Illinois limited liability company and uses the Lake Shore Drive Condo as the address for its principal office. R. 33-8. S&W has a City of Chicago license for a home business issued in May 2010. R. 33-1 (¶ 34); R. 33-10. Strabala funded the initial start-up costs of 2DEFINE through a transfer of funds from S&W, and then continued to use S&W as the business entity that would receive payments from and pay bills for 2DEFINE even while he worked out of Shanghai. R. 33-1 (Strabala Decl. ¶ 22); *see* R. 33-1 (¶ 37); R. 33-13 (documentation showing money transfers from 2DEFINE's Shanghai office, via the Bank of China, to S&W in Chicago). Through S&W, Strabala has hired contract employees in Chicago to work on Strabala's design projects overseas, paying them a substantial amount of money in 2012. R. 41-1 at 4 (Strabala Dec. ¶ 12); R. 41-2 at 35.

In addition to the above, Strabala's 2015 Membership Application to The American Institute of Architects, signed by Strabala in November 2014, lists the Lake Shore Drive Condo as Strabala's address. R. 33-1 (¶ 35); R. 33-11. And

Strabala opened a bank account in Illinois in 2010 also using the Lake Shore Drive Condo address. R. 33-1 (¶ 36); R. 33-12. The fact that Strabala also maintains or has maintained bank accounts in either Texas or China and used those while in those places does not weigh against a conclusion that Illinois is his domicile, as one would expect him to have banking connections in the place where he is residing. But one would also expect, if Strabala had no intent to ever return to Illinois, that he would *not* maintain accounts in Illinois. Therefore, the salient fact is not that Strabala has bank accounts in China or that he had one in Houston, but that he has bank accounts in Illinois, which he never gave up and still uses today.

Strabala also advertises himself in his "LinkedIn" page as an American architect employed and located in Shanghai, Seoul and Chicago, with promotional materials for 2DEFINE also indicating the existence of offices in Chicago, Seoul, and Shanghai. Zhang and Zhou dispute whether 2DEFINE has or ever had an office in Chicago, but they cannot dispute the evidence in the record showing that 2DEFINE *advertised itself* as having one. The relevant point is that Strabala sought to maintain his ties with Chicago by advertising an office there rather than that an actual or official "Chicago office" exists. Finally, Strabala testified that he has had a landline telephone number with a Chicago area code for the last twenty to thirty years. One would not expect a person who intends to abandon his domicile in Illinois to maintain a landline telephone number in that state for more than two decades.

Ignoring all of the above, Defendants' contention regarding Strabala's current ties to Illinois being practically non-existent appears to be a reference solely to the fact that Strabala has not visited Chicago very often over the last several years. He testified that he tries to come to Chicago for about one month every fall, but that he did not do so in 2015 because his mother was gravely ill that year and he visited her in Arizona instead. While Strabala's infrequent visits to Illinois are relevant, the Court finds they are not dispositive of his intent in this case. Rather, Strabala's contacts to Shanghai evince an intent to do business there, while his contacts to Chicago evince an intent to both do business *and* more importantly to maintain a home here, and the latter is more significant for purposes of domicile. *See DTC Telecom, L.L.C.*, 2002 WL 31553932, at *3 (holding that the plaintiff was domiciled in the state where his contacts showed "a conscious effort to create home base and a life," as opposed to the state where they showed "a business relationship within" the state). Further, Strabala's living situation in Shanghai does not demonstrate an intent to "maintain [his] residency [there] indefinitely" and thereby "turn residence in fact into a domicile in law." *Perry,* 16 F.3d at 140. The Court thus concludes that the preponderance of the evidence supports Strabala's declared intent to not abandon his domicile in Chicago, notwithstanding the time he has been away by moving first to Houston and then Shanghai. Accordingly, Strabala continues to be domiciled in Illinois, and thus subject matter jurisdiction exists.

## PERSONAL JURISDICTION

A challenge to a court's exercise of personal jurisdiction over a defendant is made under Federal Rule of Civil Procedure 12(b)(2). Strabala bears the ultimate burden of demonstrating by a preponderance of the evidence that the Court may exercise personal jurisdiction over Zhang and Zhou. *See Durukan Am., LLC v. Rain Trading, Inc.*, 787 F.3d 1161, 1163-64 (7th Cir. 2015). But he need only make a prima facie showing at this time. *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012). For purposes of that prima facie showing, the Court will accept as true all well-pleaded facts alleged in the complaint and resolve any factual disputes in the affidavits in favor of Strabala. *See Swanson v. City of Hammond*, 411 Fed. App'x 913, 915 (7th Cir. 2011) (unpublished). "If the existence of jurisdiction turns on disputed factual questions the court . . . may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question." *Combs v. Bakker,* 886 F.2d 673, 676 (4th Cir. 1989).

The Court looks to Illinois's long-arm statute to determine whether it may exercise personal jurisdiction over Defendants. *See Philos Techs., Inc. v. Philos & D, Inc.,* 802 F.3d 905, 912 (7th Cir. 2015) ("District courts exercising diversity jurisdiction apply the personal jurisdiction rules of the state in which they are located."). That statute provides that the outer boundary of the personal jurisdiction of an Illinois court is set by the Due Process Clause of the Fourteenth Amendment. *See* 735 Ill. Stat. Ann. 5/2–209(c). Under the Due Process Clause, a court may exercise personal jurisdiction over an out-of-state defendant when that defendant

has "minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash., Office of Unemployment Compensation & Placement*, 326 U.S. 310, 316 (1945) (internal quotation marks and citation omitted). "'The defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). While there are two branches of personal jurisdiction theory—general and specific—only the latter is relevant here. For a court to exercise specific jurisdiction, the lawsuit must "result[ ] from alleged injuries that 'arise out of or relate to'" the defendant's contacts with the forum. *Burger King*, 471 U.S. at 472-73 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). Defendants do not contest that if minimum contacts exist here, Strabala's injuries arise out of or relate to those contacts and thus specific jurisdiction would be established.

The Seventh Circuit has noted that the nature of the constitutional minimum contacts inquiry of purposeful-direction/purposeful-availment differs depending on whether the plaintiff's claims are for breach of contract or lie in tort. *Felland*, 682 F.3d at 674. Strabala alleges two tort claims in the complaint—Count I for defamation, and Count II for "intentional interference." The specific personal jurisdiction inquiry must be conducted separately for each of these counts. *See In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial*

*Proceedings*, 164 F. Supp. 3d 1040, 1047 (N.D. Ill. 2016). Where, as here, the plaintiff has alleged tort claims, the Seventh Circuit looks to the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984), for guidance. *See Felland*, 682 F.3d at 674. The Supreme Court held in *Calder* that a California court could exercise personal jurisdiction over Florida residents who had written and edited an allegedly libelous article concerning an actress who was a California resident. 465 U.S. at 785-86. The Court rejected the defendants' arguments that they were not responsible for the distribution of their article in California and had no stake in its publication there, holding instead that the defendants' intentional and allegedly tortious actions were expressly aimed at California. *Id.* at 789. The Seventh Circuit has "distilled three requirements from *Calder* for determining whether conduct was 'purposefully directed' at the forum state: '(1) intentional conduct (or "intentional and allegedly tortious" conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state.'" *Felland*, 682 F.3d at 674-75 (quoting *Tamburo v. Dworkin*, 601 F.3d 693, 703 (7th Cir. 2010)). Defendants' challenge the Court's assertion of personal jurisdiction over them based only on the second requirement of the *Calder* test.

## A.    COUNT I–DEFAMATION

Strabala's defamation claim in Count I is based on e-mails allegedly sent by Defendants to persons in Chicago. Initially, Zhou contends that the e-mails were authored and sent by Zhang, and that he is only copied on them. Therefore, he

claims, the e-mails may justify the Court's assertion of personal jurisdiction over Zhang, but not him. Strabala alleges, however, that Zhou assisted Zhang in authoring the defamatory e-mails. There is no evidence in the record to contest that allegation, and, even if there were, the Court must resolve disputed facts in Strabala's favor. Moreover, Zhou admits he co-authored the allegedly defamatory letter to Anthony Wood and participated in Zhang's sending of the letter to Wood by e-mail with the intent that Wood would receive and read the letter. Therefore, Strabala has alleged sufficient facts against Zhou to warrant the Court's assertion of personal jurisdiction over him if personal jurisdiction based on the defamatory e-mails is warranted.

Next, Defendants both argue, based on *Advanced Tactical Ordnance Systems, LLC v. Real Action Paintball, Inc.*, 751 F.3d 796 (7th Cir. 2014), that the sending of e-mails does not amount to conduct expressly aimed at Illinois. But that case is distinguishable. The Seventh Circuit held in *Advanced Tactical Ordnance Systems* that "the sending of two allegedly misleading emails to a list of subscribers that included Indiana residents," *id.* at 802, did not establish constitutionally sufficient minimum contacts with Indiana. Defendants rely on the following explanation the court gave for its holding:

> The fact that Real Action maintains an email list to allow it to shower past customers and other subscribers with company-related emails does not show a relation between the company and Indiana. Such a relation would be entirely fortuitous, depending wholly on activities out of the defendant's control. As a practical matter, email does not exist in any location at all; it bounces from one server to another, it starts wherever the account-holder is sitting

when she clicks the "send" button, and it winds up wherever the recipient happens to be at that instant. The connection between the place where an email is opened and a lawsuit is entirely fortuitous. We note as well that it is exceedingly common in today's world for a company to allow consumers to sign up for an email list. We are not prepared to hold that this alone demonstrates that a defendant made a substantial connection to each state (or country) associated with those persons' "snail mail" addresses.

*Id.* Defendants ignore, however, that immediately following the above explanation the Seventh Circuit distinguished the situation where there is "evidence that a defendant in some way targeted residents of a specific state, perhaps through geographically-restricted online ads." *Id.* That situation, the court explained, "may be different" because "the focus would not be on the users who signed up, but instead on the deliberate actions by the defendant to target or direct itself toward the forum state." *Id.*

Here, Strabala does not allege that Defendants sent out blast e-mails to anyone who happened to put their name on a list of subscribers. Instead, Strabala alleges that Defendants targeted specific individuals who they knew had a business relationship to Strabala, and they did so with the intent, purpose and effect of defaming him to those individuals. "Concluding that intentionally tortious emails cannot give rise to personal jurisdiction would insulate from liability a ubiquitous form of communication and entirely negate the otherwise permissible exercise of jurisdiction over defendants who purposefully directed their activities at a forum state without entering the state." *Leibman v. Prupes*, 2015 WL 898454, at *10 (C.D. Cal. Mar. 2, 2015) ) (internal quotation marks and citations omitted) (distinguishing

*Advanced Tactical Ordnance Systems* in holding that the defendant's alleged actions in that case of sending extortionate e-mails to a targeted California resident created minimum contacts with California). Defendants purposefully aimed their conduct at Illinois by seeking to damage Strabala's reputation in Illinois where the e-mail recipients were located. *See Walden v. Fiore*, 134 S. Ct. 1115, 1124 (2014) ("because publication to third persons is a necessary element of libel, the defendants' intentional tort [in *Calder*] actually occurred *in* California") (emphasis in original; internal citation omitted); *Vizant Techs., LLC v. Whitchurch*, 97 F. Supp. 3d 618, 632 (E.D. Pa. 2015) ("When a district court's personal jurisdiction over a defendant for a defamation claim is in dispute, where defendants aimed their defamatory statements is jurisdictionally significant." (internal quotation marks and citation omitted)). Thus, Defendants' relationship to Illinois cannot be said to be "entirely fortuitous" and "dependent wholly on activities out of [their] control." *Advanced Tactical Ordnance Sys., LLC*, 751 F.3d at 803.

Defendants also contend that the "expressly aimed" requirement is not met here because they "had no idea where the email recipients (or their computer servers) were located." R. 31 at 11. The Court is skeptical that knowledge of the e-mail recipients' location is required in the context of a defamation claim. Defendants cite to the Supreme Court's recent decision in *Walden*, but that case does not speak to the issue except to the extent that it specifically distinguishes reputation-based torts from other torts for purposes of an analysis of the "express aiming" requirement. *Walden* involved airplane passengers who were detained by

the defendant police officers at an airport in Georgia. The plaintiffs sued the officers in Nevada for fraud and another intentional tort, alleging the defendants had seized and kept the plaintiffs' cash without probable cause and later lied about it in false affidavits. 134 S. Ct. at 1119-20. The Supreme Court held that the defendants' knowledge that the plaintiffs resided in Nevada and that they were headed to Nevada to gamble with the monies seized by the defendants was insufficient for a Nevada court's assertion of personal jurisdiction over the defendants. *Id.* at 1124. Due process, the Court said, requires more than just knowledge of the plaintiffs' strong forum connections or that the plaintiffs would suffer foreseeable harm in the forum from the defendants' acts. *Id.* at 1125. It requires that the defendants themselves have some contact with the forum state. *Id.* at 1126. Because the defendants' relevant conduct in that case occurred entirely in Georgia, due process barred the Nevada court from exercising specific personal jurisdiction over them. *Id.*

In emphasizing the place where the defendants' relevant conduct occurred, the *Walden* Court explained that it had reached a different result in *Calder* because the defendants' conduct in that case could be said to have "occurred" in the forum state because of "the nature of the libel tort." *Id.* at 1124. As the Court explained, "[h]owever scandalous a newspaper article might be, it can lead to a loss of reputation only if communicated to (and read and understood by) third persons." *Id.* Accordingly, "the reputation-based 'effects' of the alleged libel [in *Calder*] connected the defendants to California, not just to the plaintiff." *Id.* at 1123-24. Applying this reasoning here, the injury occasioned in a defamation case, like a libel case, occurs

in the state where the e-mail recipients are located. But the Court in *Walden* specifically declined to discuss "the very different questions whether and how a defendant's virtual 'presence' and conduct translate into 'contacts' with a particular State," leaving those questions "for another day." *Id.* at 1125 n.9.

The question left open by the *Walden* Court of virtual contacts and their implications for purposes of the express aiming requirement was discussed in *Facebook, Inc. v. ConnectU LLC*, 2007 WL 2326090 (N.D. Cal. Aug. 13, 2007), where the court cogently began by explaining that, in traditional, *i.e.,* non-internet based, intentional tort cases, a defendant "indisputably kn[o]w[s] at the time of [his] conduct that the targeted persons or entities [are] located in the particular forum that subsequently assert[s] jurisdiction" because "the act of targeting a forum [in that kind of case] automatically carrie[s] with it knowledge of the geographical location, *e.g.*, the sending of an actionable letter to plaintiff at a mailing address." *Id.* at *1. But where the internet is concerned, a person's conduct may be "expressly aimed at a specific person or entity in another forum that causes harm in that forum without having express knowledge as to the geographic location of the person or entity being affected." *Id*. The court concluded that "the mere fact that the Internet provided [defendants] a tool by which they could carry out their conduct against [the plaintiff] without first making efforts to learn its geographic location is not a reason to excuse them from jurisdiction to which they would otherwise be subject." *Id.* at 5. Therefore, the court held, notwithstanding language in traditional intentional tort cases that might be read to suggest otherwise, "a defendant need

not have knowledge as to *which* geographic forum" the target of the tortious internet-based conduct "resides in, so long as the conduct was aimed at and likely to cause harm in that forum." *Id.* at *1 (emphasis in original).

The Court agrees with this analysis. Strabala alleges that Defendants targeted specific individuals who they knew had a business connection to him. That Defendants were able to do so while remaining ignorant of those individuals' precise location "may render this case factually distinct from prior precedents finding jurisdiction for acts of express aiming, but not in a manner that warrants a different result." *Id.* at *6; *see also Cont'l Appliances, Inc. v. Thomas*, 2012 WL 3646887, at *7 (N.D. Cal. Aug. 23, 2012) ("The fact that [the defendant] may not have known in advance that IAS is located in California is not necessarily dispositive."); *cf. Aitken v. Commc'ns Workers of Am.*, 496 F. Supp. 2d 653, 660 (E.D. Va. 2007) (holding that "a spammer may not avoid personal jurisdiction by simply pleading ignorance of where the[ ] servers were physically located, nor by pleading ignorance of the email recipient's location," explaining that "[a] contrary result would permit spammer and other tortfeasors to escape jurisdiction simply by turning a blind eye to the natural consequences of their actions") (internal quotation marks and citation omitted). Indeed, if lack of knowledge were an excuse, a defendant could insulate himself from being sued anywhere except in his home state by choosing to remain ignorant of the locations of his victims.[31]

---

[31] A number of cases appear to reach a contrary conclusion in holding that the defendant must have knowledge of where the target of his or her internet-based conduct is located. But those cases either (1) do not involve a reputation-based tort,

In any event, even if knowledge of the e-mail recipients' location is required, Strabala alleges that the people to whom Defendants addressed the e-mails were known by them to live in Illinois, and he submits as evidence his declaration stating that Zhang worked at the San Francisco office of SOM and knew the precise names of the Chicago staff of SOM whom he "selectively targeted with defamatory e-mails." R. 41-1 at 4-5 (Strabala Decl., ¶ 13); *see also* R. 31-3 at 6 (¶ 26) (Zhou worked at Gensler's Shanghai office from 2008 until 2010). Strabala also attaches pages from the internet showing that the location of at least some of the e-mail recipients was publicly available. *See Premedics, Inc. v. Zoll Med. Corp.*, 2007 WL 3012968, at *5 (M.D. Tenn. Oct. 9, 2007) ("Premedics' physical location and incorporation in the state of Tennessee are facts plainly stated on the home page of the Premedics website, obvious to anyone who views the website"). Because, as previously noted, all factual discrepancies must be resolved in Strabala's favor, the Court cannot rely on Defendants' statements to the contrary to rule in their favor on a motion to dismiss. *See, e.g., Levin v. The Posen Foundation,* 62 F. Supp. 3d 733, 740 (N.D. Ill. 2014) ("Since controverted facts are resolved in Levin's favor for the purpose of this motion, the court finds that Levin has sufficiently alleged and supported the

---

where the defendant's tortious conduct by definition occurred in the place where the defamatory statements were published, *see, e.g., Rice v. Karsch,* 154 Fed. App'x 454, 455 (6th Cir. 2005) (unpublished) *(*breach of contract); *Watiti v. Walden Univ.*, 2008 WL 2280932, at *10-11 (D.N.J. May 30, 2008) (breach of contract and fraud), or else (2) deal with the *Advanced Tactical Ordnance Systems, Inc.*-type situation of blast e-mails, where the geographically targeted online activity is too dispersed to warrant a finding of express aiming, *see, e.g., Shrader v. Biddinger,* 633 F.3d 1235, 1247-48 (10th Cir. 2011); *United Airlines, Inc. v. Zaman*, 152 F. Supp. 3d 1041, 1051 (N.D. Ill. 2015).

contention that Young was aware that Levin resided in Illinois."); *Premedics, Inc.*, 2007 WL 3012968, at *5 ("Construing the facts and pleadings in the light most favorable to Plaintiff, the Court concludes that Defendants knew or should have known that Plaintiff was located in Tennessee when Johnson accessed Premedics' website.").

Finally, the Court also does not find convincing Defendants' argument that one of the e-mail recipients, Anthony Wood, happened to be in China when the e-mail was sent so that he may have opened the e-mail there rather than at his office in Illinois. In the first place, Defendants offer only their own speculation as to when Wood was likely to have opened the e-mail. But in any case, their argument misses the point. If Defendants sent a defamatory e-mail to an e-mail address of a business or person located in Illinois, it does not matter, for purposes of deciding whether Defendants expressly aimed their conduct to and caused injury in the forum state, where the person who opened the e-mail was at the time he or she opened the e-mail. As the Seventh Circuit explained, "email accounts can generally be accessed in any state, so it may not make much sense to say that they were 'sent to' a Wisconsin address." *Felland*, 682 F.3d at 676 n.3. "*Nevertheless*," the court continued, the defendant "purposefully sent the[ ] emails to [forum] residents knowing that they would most likely be read and have their effect in [there]." *Id.* (emphasis added). In other words, the jurisdictional inquiry does not turn on where the e-mail was opened—a purely "fortuitous" place by virtue of the nature of e-mails. Instead, the question for jurisdictional purposes is where the person or entity who is targeted by

the e-mail is based. *See Cont'l Appliances, Inc.*, 2012 WL 3646887, at *6-7 (rejecting

defendant's argument that his alleged tortious conduct in alerting a company based

in California about a defamatory YouTube video did not target California because

he contacted an employee of the company knowing that employee resided in Ohio;

court holds that the employee's location in Ohio was not relevant because the

defendant's purpose in contacting him was to injure the plaintiff's reputation with

the employee's company, which was located in California).[32]

In sum, Strabala has made a prima facie case for the Court to assert personal

jurisdiction over Defendants as to Count I.[33]

---

[32] The Court believes this is the proper rule even if, as Defendants contend, *their intent was* that Wood open the e-mail with the letter attached while he was in China attending a conference. *See, e.g., Fletcher v. Doig*, 125 F. Supp. 3d 697, 709 (N.D. Ill. 2014) (quoting *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1075 (10th Cir. 2008) (describing the defendant's intent as "something like a bank shot in basketball" where the player shoots the ball off the backboard intending for it to hit the backboard, but, in so intending, his "express aim" is really to put the ball into the basket)).

[33] Normally, before concluding that a prima facie case for personal jurisdiction exists, the Court would also have to consider whether jurisdiction in Illinois would violate notions of fair play and substantial justice. *See Felland*, 682 F.3d at 677 (factors relevant to the fair play and substantial justice inquiry include "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies") (quoting *Burger King*, 471 U.S. at 477) (internal quotation marks omitted)). But Defendants did not raise the issue in their briefs, and, accordingly, they have waived any argument on that point. The Court recognizes that litigating in the United States may impose some burden on Defendants, who are Chinese nationals residing in China, but notes that is not a reason in itself to decline to exercise personal jurisdiction over them. *See NetApp, Inc. v. Nimble Storage, Inc.*, 41 F. Supp. 3d 816, 828 (N.D. Cal. 2014) ("courts have appropriately exercised jurisdiction over foreign parties") (citing cases).

## B.    Count II—Intentional Interference

The factual basis for Count II is the tortious conduct allegedly committed by Defendants other than the allegedly defamatory e-mails, such as interfering with 2DEFINE's website, clients, employees, contracts, and accounts receivables.[34] According to Defendants, "[a] defendant does not expressly direct his conduct toward Illinois simply by operating a website and using it to communicate information to the world at large." R. 31 at 10. Strabala apparently concedes as much, but argues that this Court has personal jurisdiction over Defendants because, "by their defamatory and letter campaign, directed at the forum state of Illinois, Defendants intentionally interfered with and defamed Strabala." R. 33 at 7. This argument attempts to merge the personal jurisdiction analysis for Count II with the analysis for Count I. The alleged defamatory e-mails do not establish a factual basis for Count II. Strabala makes no legal argument explaining why the Court may assert personal jurisdiction over Defendants for a claim based on the

---

[34] Specifically, the complaint alleges that: (1) Defendants secretly created two Chinese partnerships with names similar to 2DEFINE and used those partnerships to misappropriate funds owed to 2DEFINE, R. 1 (¶¶ 20-22); (2) Defendants stole property belonging to 2DEFINE and to Strabala, stopped paying 2DEFINE employee salaries and expenses and, in effect "destroyed the Shanghai office of 2DEFINE by diverting company funds to their personal bank accounts, leaving 2DEFINE with no income and only debts," *id.* (¶ 24); (3) Zhang falsely advertises on the Internet to individuals in the United States that he has a valid U.S. architectural license, *id.* (¶ 26); (4) Defendants have been doing business with contracts, equipment and some employees diverted from 2DEFINE, and they have tortiously interfered with Strabala's business and future economic prospects by among other things visiting at least one of Strabala's clients, demanding contractual information for a project on which Strabala was hired, and indicating that payments due Strabala should be diverted to Defendants instead, *id.* (¶¶ 26-28); and (5) Defendants have been providing Strabala's confidential business information to Gensler and SOM, *id.* (¶ 29).

tortious conduct on which Count II is based, nor does the Court perceive there to be any. The tortious conduct alleged, if it occurred, would have happened mostly if not solely in China. A possible exception is the alleged communications with Gensler and SOM. But Gensler, according to the facts in the record, is located in Texas, and Strabala does not give any details regarding the alleged communications with SOM that would allow the Court to conclude it had personal jurisdiction for a claim based on those communications. Accordingly, Count II of the complaint, as well as any defamation claim Strabala might be attempting to assert based on e-mails or other communications with persons located in places outside Illinois (such as employees of Gensler's Houston office), are dismissed for lack of personal jurisdiction over Defendants as to those claims.[35]

---

[35] Count II is dismissed for the additional reason that it fails to state a legally sufficient claim for relief. To state a claim for tortious interference with contract, a plaintiff must allege, among other things, a valid contract, a breach of that contract, and resulting damages. *See George A. Fuller Co. v. Chi. Coll. of Osteopathic Med.*, 719 F.2d 1326, 1330 (7th Cir. 1983). Strabala's vague references to unidentified contracts do not put Defendants on notice of the basis for his claim; he must identify specific contracts that were breached. Moreover, Strabala does not specifically allege that any of the contracts with which Defendants supposedly interfered were actually breached, or explain in what way they were breached and by whom. Nor does he explain the factual basis for his claim that he suffered damages from the alleged interference. *See, e.g., Peco Pallet, Inc. v. Nw. Pallet Supply Co.*, 2016 WL 5405107, at *13 (N.D. Ill. Sept. 28, 2016) ("Fatal to its claim, however, Northwest fails to identify any breach of contract resulting from PECO's conduct, alleging only that PECO attempted to induce a breach.") (citing *Miller UK Ltd. v. Caterpillar Inc.*, 2015 WL 6407223, at *6 (N.D. Ill. Oct. 21, 2015) ("[A]n element of a tortious interference with contract claim under Illinois law is an actual breach caused by the defendant's conduct, not the mere possibility of breach."). In short, the allegations wholly fail to inform Defendants of the factual basis for Strabala's claim. The same is true if Strabala is intending to assert a claim for tortious interference with business expectancy. For that claim, Strabala needs to identify in a non-conclusory fashion, among other things, the specific business relationships for which he had a

**SERVICE OF PROCESS**

A motion to dismiss based on invalid service of process is brought pursuant to Federal Rule of Civil Procedure 12(b)(5). The burden of proving effective service of process is on the plaintiff. *Cardenas v. City of Chicago*, 646 F.3d 1001, 1005 (7th Cir. 2011). The method of service of process is governed in this case by Federal Rules of Civil Procedure 4. *See Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002) ("Even though the case is governed by state law, the method of service . . . will be governed by Fed. R. Civ. P. 4"). Rule 4(f) describes the manner for serving an individual in a foreign country. The Court is concerned here with two sections of Rule 4(f): (1) Rule 4(f)(1), which provides that service may be accomplished "by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention"; and (2) Rule 4(f)(3), which allows service "by other means not prohibited by international agreement, as the court orders."

### A.  SERVICE UNDER THE HAGUE CONVENTION

Defendants first contend that service of process was inadequate because Strabala failed to serve them under Rule 4(f)(1) according to the methods prescribed by the Hague Convention. The Hague Convention is an international treaty

---

reasonable expectancy of entering into, as well as the specific conduct of Defendants that interfered with those business expectancies, how that conduct worked an interference, and how the interference resulted in injury to Strabala. Simply stating that Strabala had a business expectancy, which Defendants interfered with thereby causing Strabala harm, is conclusory and insufficient to put Defendants on notice of Strabala's claim. *See Am. Audio Visual Co. v. Rouillard*, 2010 WL 914970, at *2 (N.D. Ill. Mar. 9, 2010); *Peco Pallet, Inc.*, 2016 WL 5405107, at *13-14.

formulated to provide a simpler way to serve process abroad. *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 698 (1988). The primary means of service under the Hague Convention is through a receiving country's "central authority," which receives requests for service, arranges for service, and returns proofs of service. *Id.* at 698-99. Strabala initially attempted service through the Hague Convention when, after having the summons and complaint translated to Chinese, he requested service upon Defendants through China's Ministry of Justice. R. 10 at 2, 7-20. The request was made on May 14, 2015, and, as of November 10, 2015, Strabala had not yet received a response from the Ministry of Justice. *Id.*

"The Hague Convention does not specify a time within which a foreign country's Central Authority must effect service, but Article 15 does provide that alternate methods may be used if a Central Authority does not respond within six months." Fed. R. Civ. P. 4, Advisory Committee Notes, 1993 amendments. "The decision whether to allow alternate methods of serving process under Rule 4(f)(3) is committed to the 'sound discretion of the district court.'" *Brockmeyer v. May*, 383 F.3d 798, 805 (9th Cir. 2004) (citations omitted); *see also Hinsey v. Better Built Dry Kilns, Inc.*, 2009 WL 1766883, *2, (N.D. Ind. June 22, 2009) ("Rule 4(f)(3) provides the Court with flexibility and discretion empowering courts to fit the manner of service utilized to the facts and circumstances of the particular case.") (internal quotation marks and citation omitted); *see, e.g., Stream SICAV v. Wang,* 989 F. Supp. 2d 264, 280 (S.D.N.Y. 2013) (authorizing alternative service in China because significant delay was likely if service was sought through the Chinese

Ministry of Justice); *In re LDK Solar Secs. Litig.*, 2008 WL 2415186, *1 (N.D. Cal. June 12, 2008) (authorizing an alternative means of service on Chinese defendants without first attempting "potentially fruitless" service through the Hague Convention's Chinese Central Authority).

Court-directed service pursuant to Rule 4(f)(3) is appropriate when, for example, "there is a need for speed that cannot be met by following the Hague Convention methods, when the Central Authority of the foreign country has refused to serve a particular complaint (perhaps based on its own public policy or substantive law limitations), or when a foreign country's Central Authority *fails to effect service within the six-month period provided by the Hague Convention.*" 4B FED. PRAC. & PROC. CIV. § 1134 (4th ed.) (emphasis added). Strabala waited six months, and, not having heard from the Ministry regarding his request for service, he moved the Court for an order pursuant to Rule 4(f)(3) to serve Defendants by alternate means. Strabala was not out of line in doing so, and the Court's grant of that motion was appropriate. *See Bazarian Int'l Fin. Assocs., L.L.C. v. Desarrollos Aerohotelco, C.A.,* 168 F. Supp. 3d 1, 16 (D.D.C. 2016) (holding that the plaintiff was "not required to first demonstrate a minimum threshold effort to serve Defendants via . . . the Hague Convention," and, even if he was, "this burden would have been satisfied in this case"); *see also Flava Works, Inc. v. Does 1-26*, 2013 WL 1751468, at *6-7 (N.D. Ill. Apr. 19, 2013) (in the absence of any directive from the Seventh Circuit, "the court finds that Rule 4(f) does not indicate a preference for any method of service"); *Zhang v. Baidu.com Inc.*, 293 F.R.D. 508, 514 (S.D.N.Y. 2013)

(concluding that the court "has discretion to authorize alternative service . . . pursuant to Rule 4(f)(3) notwithstanding China's refusal to effect service under the Hague Convention on the ground that doing so would infringe its sovereignty and security").[36]

## B.    PROOF OF SERVICE

Rule 4(f)(3) permits the court to order service by any means not prohibited by international agreement, as long as the method of service comports with constitutional notions of due process. *U.S. Commodity Futures Trading Comm'n*, 2008 WL 4299771, *4. Defendants do not argue that the method of service ordered

---

[36] Defendants quote from the Supreme Court's opinion in *Volkswagenwerk Aktiengesellschaft* to the effect that "compliance with the [Hague] Convention is mandatory in all cases to which it applies." 486 U.S. at 705. To begin with, because Strabala apparently did not know Defendants' correct physical addresses, the Hague Convention does not apply. *See D.Light Design, Inc. v. Boxin Solar Co.,* 2015 WL 526835, at *2 (N.D. Cal. Feb. 6, 2015) ("[D]espite Plaintiffs' diligent effort to locate the addresses of Defendants, the physical addresses of Skone Lighting and Sailing Motor remain unknown. Because the physical addresses of these Defendants are unknown, the Hague Convention does not apply." (citing Art. 1, 20 U.S.T. 361, 658 U.N.T.S. 163, and *Liberty Media Holdings, LLC. v. Sheng Gan*, 2012 WL 122862, at *3 (D. Colo. 2012) (holding that the Hague Convention does not apply to defendant who lived in China and whose address was unknown)); *see also U.S. Commodity Futures Trading Comm'n v. Lake Shore Asset Mgmt. Ltd.*, 2008 WL 4299771, at *4 (N.D. Ill. Sept. 17, 2008) ("Because the German address proved to be incorrect and the CFTC could not find Mr. Baker, the Hague Convention . . . does not govern the CFTC's efforts to serve Mr. Baker." (citing *BP Prods. N. Am., Inc. v. Dagra,* 232 F.R.D. 263, 264 (E.D. Va. 2005), quoting 20 U.S.T. 361 (U.S.T.1969) ("the Hague Convention contains an explicit exemption where the address of the foreign party to be served is unknown: 'This Convention shall not apply where the address of the person to be served with the document is not known'")). In any event, the Court agrees with the analysis in *In re GLG Life Tech Corp. Secs. Litig.*, 287 F.R.D. 262, 266 (S.D.N.Y. 2012), that *Volkswagenwerk* "does not hold or even suggest that the Hague Convention must always be complied with before alternative service is ordered," and that  the quoted language from that case is "dictum." *Id.* at 266 n.7.

71

by the Court under Rule 4(f) and on which Strabala relies for having effected service—that is, service by e-mail[37]—was legally insufficient. For instance, Defendants do not argue that service by e-mail violates any international agreement, nor do they argue that it does not comport with constitutional notions of due process.[38] Moreover, service of process by e-mail has been upheld in circumstances similar to those here. *See, e.g., Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1018 (9th Cir. 2002) ("When faced with an international e-business scofflaw, playing hide-and-seek with the federal court, e-mail may be the only means of effecting service of process."); *MacLean-Fogg Co. v. Ningbo Fastlink Equip. Co.*, 2008 WL 5100414, at *2 (N.D. Ill. Dec. 1, 2008) (granting leave to serve a defendant located in China by e-mail and facsimile, and noting that because the "Hague Convention does not prohibit service by e-mail or facsimile, such means may be authorized under Rule 4(f)(3)."); *see also Phillip Morris USA v. Veles Ltd.*, 2007 WL 725412, at *3 (S.D.N.Y. Mar. 12, 2007) (authorizing service of process by e-mail in trademark action where on-line stores did not post any physical address and

---

[37] The Court also ordered service by Federal Express delivery, but that method proved unsuccessful. *See* R. 33-17 (¶ 2) (stating that an "unknown" person advised the Fed Ex delivery person that Defendants "did not reside where their addresses showed they did," and, as a result, "the Fed Ex packages were returned . . . with the notation regarding why the packages were not accepted").

[38] Defendants do argue that service by e-mail does not comply with Chinese law. But nothing in Rule 4(f)(3) requires that the alternative service ordered by the court pursuant to that provision must comply with the law of the foreign state where the service is to be effected. Defendants fail to provide any case authority to the contrary, and therefore have waived that argument. *See United States v. Hassebrock,* 663 F.3d 906, 914 (7th Cir. 2011) (explaining that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived") (internal quotation marks and citation omitted).

defendant's "business appear[ed] to be conducted entirely through electronic communications"). Therefore, the only issue before the Court regarding the service that was ordered under Rule 4(f)(3) is Zhang's contention that he never received the service e-mail with the complaint and summons attached. *See* R. 31-2 at 4-5 (¶ 15) (I did not ever receive any e-mail communications from Strabala's attorney with documents relating to the Illinois Litigation at my actual e-mail addresses or in any other way).[39]

Proof of service is governed by Rule 4(l), which provides in relevant part that where, as here, service is made under Rule 4(f)(3), service must by proved "by a receipt signed by the addressee, or by other evidence satisfying the court that the summons and complaint were delivered to the addressee." Fed. R. Civ. P. 4(l)(2)(B). A receipt signed by the addressee is usually not available when service is made by e-mail. The "other evidence" alternative typically is a signed "return" from the server. In this case, Strabala has submitted a return of service signed by someone named Pamela M. Ickes, which states that, "[p]ursuant to this Court's Order of November 17, 2015, I served Defendants Qiao Zhang and Zhou Shimiao on that same day with the Complaint and Summons via Federal Express and personal email. I received no 'bounce back' or other notice of rejection of those emails to either Defendant." R. 33-17.

Ordinarily, "[a] signed return of service constitutes *prima facie* evidence of valid service which can be overcome only by strong and convincing evidence." *Homer*

---

[39] Zhou admits that he received the e-mail service.

*v. Jones-Bey*, 415 F.3d 748, 752 (7th Cir. 2005) (internal quotation marks omitted) (quoting *O'Brien*, 998 F.2d at 1398). "Once such a *prima facie* showing is made, the burden shifts to the defendant to demonstrate that service was not received." *Id.* "Furthermore, [a]n uncorroborated defendant's affidavit merely stating that he [has] not been personally served with summons is insufficient to overcome the presumption favoring the affidavit of service." *Fleet Mortg. Corp. v. Wise*, 1997 WL 305319, at *2 (N.D. Ill. May 29, 1997) (internal quotation marks and citation omitted). But the Seventh Circuit has said that "it is questionable whether the presumption of service and the burden-shifting scheme referenced in *O'Brien* . . . applies to returns of service that do not specify the address used or the identity of the individual who accepted the mailing." *Homer*, 415 F.3d at 752. Ms. Ickes does not give the e-mail addresses to which she sent the summons and complaint. This is a problem, because Zhang denies that the correct e-mail address was used for him. *See* R. 31-2 at 4-5 (¶ 15).[40]

But Zhang's affidavit also is problematic. He states only that he "understand[s] that Strabala's attorney has stated that he attempted to e-mail Illinois Litigation documents to me" at an e-mail address that Zhang says is

---

[40] As Defendants point out, the form of Ms. Ickes' return of service leaves much to be desired in other ways as well. For one, although she represents that she has been "first duly sworn on oath," Ms. Ickes' signature is not notarized. Moreover, Ms. Ickes does not identify herself, her employer, or her relationship, if any, to the parties in this case. Nevertheless, Rule 4(l)(2)(B) does not impose any specific requirements on the form of the return of service other than that it must "satisfy[ ] the court that the summons and complaint were delivered to the addressee." Therefore, the Court focuses here on the primary problem it finds with Ms. Ickes' return of service, which is that it does not state the e-mail addresses to which the summons and complaint were sent.

incorrect. *Id.* In other words, Zhang has no personal knowledge of what e-mail addresses were used by Ms. Ickes for service, and, in fact, indicates by his affidavit that his testimony concerning Ms. Ickes' use of an incorrect e-mail address is based on hearsay upon hearsay (*i.e.,* an unidentified person told Zhang that Strabala's attorney told the unidentified person that the incorrect e-mail address was used). To make matters worse, the information Zhang apparently received informing him that the wrong e-mail address was used is contradicted by Strabala's motion to serve Defendants by alternative means, which specifies two e-mail addresses for service on Zhang, including one that Zhang admits is correct. *See* R. 10.[41]

It is possible that the source of Zhang's information about what e-mail addresses were used is mistaken, and that Ms. Ickes in fact used the correct e-mail address as shown on the motion to serve by alternative means. If that is the case, Ms. Ickes' return of service, which states that she served Zhang by e-mail and received no "bounce back," would "carry the day." *Fleet Mortg. Corp.*, 1997 WL 305319, at *2. But it also is possible that Ms. Ickes made the typographical error that Zhang says in his affidavit she made, and that she in fact did not send the summons and complaint to Zhang's correct e-mail address. There simply is no way

---

[41] Strabala's motion to serve by alternative means states that one of the e-mail addresses Strabala intended to use for service on Zhang was zq.phone@gmail.com. Zhang states in his affidavit that this e-mail address is correct. But he contends that the e-mail address actually used by Ickes was zp.phone@gmail.com; that is, he contends that Ms. Ickes mistakenly substituted a "p" in place of the "q" in the e-mail address. But, again, he has no personal knowledge of whether Ms. Ickes indeed made a typographical error, and there is no other evidence in the record from which the Court can conclude that she did. At the same time, the evidence in the record to support the conclusion that Ms. Ickes did *not* make a typographical error in the e-mail address is also very thin.

for the Court to know on the current record which of these two possibilities happened.

The Court echoes the sentiments expressed by Judge Evans in his dissent in *United States v. Ligas*, 549 F.3d 497, 504 (7th Cir. 2008), that it is "regrettable [ ] we are squabbling over service of process" in this case; Zhang has notice of the lawsuit and is represented by able counsel actively litigating on his behalf. If in fact the e-mail did not reach Zhang when it was sent because of a typo in the e-mail address, he has not been prejudiced by that error. Zhang learned almost immediately that formal service had been successful on Zhou, and he admits that he has known about the contents of the complaint for months already from Strabala's hand-delivery at a court proceeding in Shanghai. More fundamentally, if service of process on Zhang was defective, the case will not be dismissed. Courts routinely grant extensions of time to cure defects in service of process, even retroactively when the time limit for service has expired. *See Karney v. City of Naperville,* 2016 WL 6082354, at *2 (N.D. Ill. Oct. 18, 2016) ("Rule 4(m) preserves the Court's discretion to extend the deadline for service of process even without a showing of good cause."); *Rivera v. Riley Cnty. Law Bd.*, 2011 WL 4686554, at *3 (D. Kan. Oct. 4, 2011) ("When a court finds service of process insufficient but curable, it should generally quash the service and give the plaintiff an opportunity to re-serve the defendant."). Here, it is not even necessary that the Court grant an extension of time because service of process on a foreign defendant pursuant to Rule 4(f) is not subject to any time constraints. *See* Fed. R. Civ. P. 4(m). Therefore, all Zhang would

accomplish by successfully contesting service of process is to force Strabala to engage in the seemingly pointless exercise of sending the e-mail to him a second time.

Ultimately, it is Strabala's burden of proof to establish legally sufficient service of process, and the Court is constrained to hold that he has not met that burden here because of the fact that Ickes' return of service does not state the e-mail address to which she sent the summons and complaint. But Federal Rule of Civil Procedure 4(l)(3) provides that "[f]ailure to prove service does not affect the validity of service. The court may permit proof of service to be amended." Accordingly, Strabala can file an amended return of service stating, under penalty of perjury, that the complaint and summons were sent to one of Zhang's correct e-mail addresses, specifically setting forth the e-mail address that was used. If Strabala is unable to provide an appropriate amended proof of service—either because the previous e-mail service was not sent to a correct address or because information concerning what e-mail addresses Ickes in fact used is no longer available—Strabala can cure the defect in the previous service attempt by re-sending the summons and complaint to the correct e-mail address and then filing a new return of service with the Court proving the new service. Or, Zhang can simply waive service of process, in which case Strabala should file proof of the waiver.[42]

---

[42] The Court notes that Defendants state in their motion that Strabala could have sent them a waiver of service form instead of attempting service by e-mail. If Defendants intended to suggest that they would have waived service, then the Court is at a loss as to why they do not just do so now, other than, perhaps, their erroneous belief that the case must be dismissed for ineffective service.

In sum, the Court finds that (1) service of process on Zhou was effective; and (2) service of process on Zhang has not yet been shown, but, even if the original service was defective, the defect does not warrant dismissal of the complaint and instead the Court will quash the original service and Strabala can attempt to cure the defect by re-serving Zhang or obtaining a signed waiver of service from him. Accordingly, Defendants' motion to dismiss the complaint for ineffective service of process is denied.

## CONCLUSION

For the foregoing reasons, it is hereby ordered that:

1.    Defendants' Motion to Vacate, R. 22, is granted.

2.    Plaintiff's Motion to Strike, R. 41, is granted.

3.    Defendants' Motion to Dismiss, R. 30, is denied in part and granted in part as follows: (1) Defendants' motion to dismiss for lack of subject matter jurisdiction is denied; (2) Defendants' motion to dismiss for lack of personal jurisdiction is denied as to Count 1 (Defamation), and granted without prejudice as to Count II (Intentional Interference); (3) Defendants' motion to dismiss for lack of service of process is denied; and (4) Defendants' motion to dismiss Count II (Intentional Interference with Business Relations) for failure to state a legally adequate claim for relief is granted.

Further, as to Defendant Zhang, Plaintiff is ordered to file within ten days of entry of this memorandum opinion and order any one of the following: (i) an amended proof of service establishing that the original service was effective, (ii) a

new return of service establishing that the defect in the original service has been cured, or (iii) proof of waiver of service.

In addition, if Plaintiff intends to seek leave to file an amended complaint, he should file a proposed amended complaint with a brief of no more than five pages explaining why the proposed amended complaint cures the defects in the original complaint identified in this order. The proposed amended complaint and brief, or else a motion for an extension of time, must be filed within fourteen days of the date on which this memorandum opinion and order is entered. Defendants may file a response to Plaintiff's brief, also limited to no more than five pages in length, and shall do so on or before seven days after Plaintiff files the proposed amended complaint. No reply brief is to be filed.

If Plaintiff does not seek leave to file an amended complaint, Defendants shall file an answer to the complaint on or before thirty days after the date on which this memorandum opinion and order is entered. A status hearing is set for December 22, 2016 at 9:00 a.m. The parties are directed to file a proposed joint discovery plan on or before December 19, 2016.

ENTERED:

_____ Thomas M. Durkin

Honorable Thomas M. Durkin
United States District Judge

Dated: November 18, 2016